UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ANDRE COLE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 4:05CV131 CDP |
| | ) | |
| DONALD P. ROPER, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM AND ORDER

Petitioner Andre Cole is currently on death row at the Potosi Correctional

Center in Mineral Point, Missouri for the murder of Anthony Curtis. Petitioner

was convicted by a jury and sentenced to death in St. Louis County, Missouri.

Petitioner is also serving consecutive terms of life imprisonment for armed

criminal action and assault, and thirty years for burglary. Because Petitioner is

serving consecutive sentences, Missouri Attorney General Jeremiah W. Nixon is

also a proper party respondent.

Before me is Petitioner's request for a writ of habeas corpus pursuant to 28

U.S.C. § 2254. He raises numerous claims of constitutional violations. Several of

these claims are procedurally barred. All other claims fail on the merits.

Accordingly, I will deny Petitioner's request for a writ of habeas corpus. I will,

however, grant a certificate of appealability on several issues.

## I.    FACTUAL BACKGROUND

The following recitation of facts comes from the Missouri Supreme Court's

opinion affirming the conviction and sentence in this case:

> Appellant and his wife, Terri Cole (Terri), divorced in 1995 after eleven years of marriage.  Appellant was ordered to pay child support for the care of the couple's two children but his periodic failure to make payments resulted in an arrearage totaling nearly $3000.00.  Upon learning that a payroll withholding order was issued to his employer, Appellant commented to his coworkers, "Before I give her another dime I'll kill the bitch."
>
> The first payroll deduction for child support appeared on Appellant's August 21, 1998 paycheck, and several hours later Appellant forced his entry into Terri's house by throwing an automobile jack through the glass door leading to the dining room. Anthony Curtis (Curtis), who was visiting Terri, confronted Appellant and asked him to leave.  Appellant stabbed Curtis multiple times resulting in his death.  Appellant then assaulted Terri, stabbing her repeatedly in the stomach, breasts, back, and arms, and her hands when she attempted to defend herself.  Terri survived.
>
> After the attack, Appellant fled the State, but he returned to St. Louis and surrendered to the police thirty-three days later.  DNA analysis confirmed the presence of both victims' blood on the knife and the presence of Appellant's blood on the deck of Terri's home, the backyard fence, and in the street where Appellant's car had been parked.

State v. Cole, 71 S.W.3d 163, 168-69 (Mo. 2002) (en banc), cert. denied, 537 U.S.

865 (2002).

## II.     PROCEDURAL BACKGROUND

On February 26, 2002, the Missouri Supreme Court rejected the ten claims brought by Petitioner in his direct appeal and affirmed his conviction and sentence. Cole, 71 S.W.3d. 163. Petitioner then brought a motion in the Circuit Court of St. Louis County, Missouri for post-conviction relief (PCR) pursuant to Mo. Sup. Ct. R. 29.15. Following an evidentiary hearing lasting three days, the trial court denied the 29.15 motion. The Missouri Supreme Court affirmed the denial of post-conviction relief on November 23, 2004. Cole v. State, 152 S.W.3d 267 (Mo. 2004) (en banc), cert. denied, 545 U.S. 1131 (2005). On August 8, 2005, Petitioner moved to recall the mandate on his direct appeal, or alternatively, for a writ of habeas corpus pursuant to Mo. Sup. Ct. R. 91. This motion related to claims numbered herein as 7, 8 and 16. The Missouri Supreme Court denied the motion on August 30, 2005. On July 11, 2006, Petitioner filed a second motion to recall the mandate which related to claim number 4. This motion was denied by the Missouri Supreme Court on August 22, 2006.

Petitioner now seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2254, asserting that his conviction and sentence violate his Fifth, Sixth, Eighth and Fourteenth Amendment rights. Counsel have extensively briefed all the issues.

## III.   GROUNDS RAISED

Petitioner seeks habeas relief on the following grounds:

1.   Petitioner's conviction of first-degree murder and sentence of death violate the Eighth and Fourteenth Amendments because there is insufficient evidence from which a rational jury could find, beyond a reasonable doubt, that the killing of Anthony Curtis was premeditated.

2.   Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by the prosecutor's repeated and blatant misconduct on closing argument during the guilt phase of Petitioner's trial.

    A.   The prosecutor improperly injected his personal opinion regarding matters outside the record by stating that no other case "could be more important to the people of St. Louis County."

    B.   The prosecutor violated the presumption of innocence and stated his own personal opinion that anyone sitting in the defense chair is "usually there for a reason."

    C.   The prosecutor improperly argued facts not in evidence, unduly inflamed the jury, and falsely attacked Petitioner by calling him a "convicted killer."

    D.   The prosecutor's misconduct prejudiced Petitioner and made his trial fundamentally unfair.

3.   Defense counsel was constitutionally ineffective for failing to object to the prosecution's improper closing argument during the guilt phase of Petitioner's trial.

4.   Petitioner was denied due process of law, and black veniremember Vernard Chambers was denied equal protection

of the law, when the prosecution was permitted to strike Mr. Chambers for pretextual reasons under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986) – leaving no blacks on the jury after the State had stricken all three from the panel.

5.    Trial counsel's failure to inform Petitioner of a specific plea offer constituted ineffective assistance of counsel and violated Petitioner's Sixth, Eighth and Fourteenth Amendment Rights.

6.    Petitioner's Sixth, Eighth and Fourteenth Amendment rights were violated when the jurors deliberated prematurely in both phases of the trial.

7.    Petitioner's convictions violate due process because he was visibly restrained throughout the guilt phase, but without any case-specific finding that such a step was necessary.

8.    The trial court precluded Petitioner's counsel from making a full and complete opening statement, thereby denying Mr. Cole due process of law as well as the Sixth Amendment right to counsel.

9.    Because the prosecution's "amended information" did not enumerate any statutory aggravating circumstances, it deprived Petitioner of his rights under the Sixth and Fourteenth Amendments by allowing him to be convicted of, and sentenced for, crimes other than those with which he was charged.

10.   Trial counsel rendered constitutionally ineffective assistance by failing to investigate and present evidence that Petitioner suffered from an extreme mental and emotional disturbance at the time of his crimes – specifically, a major depressive disorder stemming from the traumatic events in his life in the months preceding the homicide, his personal and family history of depression, and his ongoing abuse of alcohol and steroids. Pretrial findings that Petitioner was "sane" at the time of the

crimes and was "competent" to stand trial do not excuse counsel's failure to pursue the distinct issue of an extreme mental and emotional disturbance under Missouri's statutory mitigating circumstances. Petitioner was prejudiced by counsel's failure to discover and present this evidence.

11. Trial counsel was constitutionally ineffective for failing to discover and present non-expert evidence of Petitioner's troubled state of mind, as observed by his relatives, friends, co-workers and family physician. Counsel's strategy of "humanizing" Petitioner stemmed from an inadequate investigation of Petitioner's background and was not "reasonable" under Strickland. Petitioner was prejudiced by counsel's failures.

12. Trial counsel was constitutionally ineffective in failing to investigate and present evidence regarding Petitioner's positive adjustment to prison life, in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights. Petitioner was prejudiced by counsel's failure.

13. Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by the prosecutor's misconduct on closing argument during the penalty phase of Petitioner's trial. The State's pervasive and blatant misconduct prejudiced Petitioner.

14. Trial counsel was constitutionally ineffective for failing to object to the prosecution's improper closing argument during the penalty phase.

15. The trial court violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights by excluding relevant mitigating evidence that his family and friends would visit him in prison.

16. Because he was visibly restrained without any showing that such a measure was necessary, Petitioner was sentenced to death in violation of the Eighth and Fourteenth Amendments.

17. The "depravity of mind" aggravating circumstance upon which the State chiefly relied in seeking Petitioner's death sentence is impermissibly vague and excessively broad under the Eighth and Fourteenth Amendments.

18. Petitioner's Sixth, Eighth and Fourteenth Amendment rights were violated by Instruction No. 21, which instructed the jury to consider all the evidence in deciding whether to impose a death sentence, while failing to mention the same requirement for deciding whether to impose a life sentence.

19. Petitioner's Sixth, Eighth and Fourteenth Amendment rights were violated by Instruction No. 22, which set forth the "mechanics" for the jury's sentencing determination, while omitting the jury's obligation to impose a life sentence if the mitigating circumstances outweighed the aggravating circumstances.

20. Petitioner's Sixth, Eighth and Fourteenth Amendment rights were violated by the cumulative effect of the errors described in this petition, thereby invalidating his convictions and death sentence.

## IV. <u>DISCUSSION</u>

Under 28 U.S.C. § 2254(d), when a claim has been adjudicated on the

merits in state court, an application for a writ of habeas corpus shall not be granted

unless the state court adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding.

In <u>Shafer v. Bowersox</u>, the Eighth Circuit articulated the standards for

subsection (1) as follows:

> The "contrary to" clause is satisfied if a state court has arrived "at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" but arrives at the opposite result. ... A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."... A case cannot be overturned merely because it incorrectly applies federal law, for the application must also be "unreasonable."

329 F.3d 637, 646-47 (8th Cir. 2003) (citations omitted) (quoting <u>Williams v.</u>

<u>Taylor</u>, 529 U.S. 362, 405, 411, 413 (2000)).

Under subsection (2), "a state court decision involves 'an unreasonable

determination of the facts in light of the evidence presented in state court

proceedings,' 28 U.S.C. § 2254(d)(2), only if it is shown by clear and convincing

evidence that the state court's presumptively correct factual findings do not enjoy

support in the record." <u>Lomholt v. Iowa</u>, 327 F.3d 748, 752 (8th Cir. 2003) (citing

28 U.S.C. § 2254(e)(1)); <u>Boyd v. Minnesota</u>, 274 F.3d 497, 501 n.4 (8th Cir.

2001)).

The statute's deferential standard of review, however, applies to state court

resolutions of law and fact only if the state court adjudicated the prisoner's claims on the merits.  <u>Taylor v. Bowersox</u>, 329 F.3d 963, 967-68 (8th Cir. 2003) (citing 28 U.S.C. § 2254(d); <u>Kenley v. Bowersox</u>, 275 F.3d 709, 711 (8th Cir. 2002)). The Eighth Circuit has acknowledged that there are "no bright line rules about how much a state court must say or the language it must use to compel a § 2254 court's conclusion that the state court has adjudicated a claim on the merits." <u>Brown v. Luebbers</u>, 371 F.3d 458, 461 (8th Cir. 2004).  Rather, a court "must simply look at what a state court has said, case by case, and determine whether the federal constitutional claim was considered and rejected by that court."  <u>Id.</u>

Where a federal constitutional question is not adjudicated on its merits in state court proceedings, the pre-AEDPA standard of review should apply. <u>Robinson v. Crist</u>, 278 F.3d 862, 865 (8th Cir. 2002).

## **Claim 1: Insufficient Evidence for First Degree Premeditated Murder**

In his first claim, Petitioner asserts that the evidence before the jury was insufficient to support a conviction of first degree murder, thereby violating <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).  In <u>Jackson</u>, the Supreme Court held that on habeas corpus review of the sufficiency of the evidence, the critical inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." 443 U.S. at 319.

Under Missouri law, a person commits first degree murder when that person "knowingly causes the death of another person after deliberation upon the matter." Mo. Rev. Stat. § 565.020(1). The principal distinction between first and second degree murder is the element of deliberation. State v. Johnson, 505 S.W.2d 94 (Mo. 1974). "Deliberation" is defined as "cool reflection for any length of time no matter how brief." Mo. Rev. Stat. § 565.002(3). The element of deliberation distinguishes an act committed in the heat of passion from an act that involves "unimpassioned premeditation," or "cool reflection." State v. Rousan, 961 S.W.2d 831, 851-52 (Mo. 1998). Deliberation may be inferred from the circumstances surrounding the murder. State v. Antwine, 743 S.W.2d 51, 72 (Mo. 1987). Proof of deliberation does not require evidence that the defendant contemplated his actions over a long period of time, only that the killer had ample opportunity to terminate the attack once it began. State v. Johnston, 957 S.W.2d 734, 747 (Mo. 1997) (internal citation omitted).

The Missouri Supreme Court rejected this claim on direct appeal:

> Appellant stabbed Curtis a total of twenty-one times. Thirteen of the injuries were defense wounds to his hands, eight of the wounds were located on either his head or torso, and five of these eight wounds required considerable force, having penetrated four or more inches into the body striking bone. The evidence indicated that

midway during the attack Curtis fell face down on the floor and was
no longer offering any resistance.  Appellant resumed the attack on
his incapacitated victim and inflicted multiple stab wounds to Curtis'
back, including the fatal wound that severed Curtis's aorta.
Appellant's choice to continue his assault on Curtis when he no
longer resisted provides sufficient evidence from which a reasonable
jury could find the element of deliberation beyond a reasonable
doubt.

Cole, 71 S.W.3d at 169.

Petitioner admits that there was evidence showing that he was angry and

upset with Terri Cole and that he went to her home armed.  However, he argues

that the evidence fails to show that he deliberated before killing Anthony Curtis:

he points out that he did not even know Curtis, nor did he know that Curtis would

be at Terri's home on the night of the murder.  Petitioner asserts that there is no

support in the record for the State's theory that he deliberated while inflicting the

multiple stab wounds or that Curtis was already disabled when the fatal wound in

his back was inflicted.

In viewing the evidence in the light most favorable to the verdict, as I must

according to Jackson, 443 U.S. at 326, I find that a rational juror could have found

proof of deliberation beyond a reasonable doubt.  The undisputed circumstances of

Curtis's death provide sufficient evidence of deliberation.  The sheer number of

wounds – twenty-one stab and slash wounds – creates an inference of deliberation.

See State v. Sandles, 740 S.W.2d 169, 177-78 (Mo. 1987) (twenty stab and slash wounds provided sufficient basis for inference of deliberation). In addition, from the position of Curtis's body when the final stab wound was inflicted (on his stomach on the floor leaning against the couch), one could reasonably infer that the fatal stab wound – approximately 8 inches in depth into Curtis's back – was inflicted while he was motionless on the floor and not resisting. Although Terri Cole's testimony indicates that the stabbing stopped around the time that Curtis stopped struggling,[1] Terri Cole describes an extensive struggle between Petitioner and Curtis where they fell twice and stumbled once. Petitioner had time to terminate the attack after it began. See Johnston, 957 S.W.2d at 748 (evidence of

---

[1] Upon direct examination by the State's prosecutor, Terri Cole testified to the following concerning when the attack ceased:

Q      What happened? What happened? Did he ever stop? Or you tell me. When did they stop?

A      Mr. Cole didn't stop – attackin' Anthony until Anthony fell down for the last time on the floor.
...
Q      Before – what happened before Anthony stopped moving? When Anthony was on the ground did Mr. Cole leave him alone?

A      No. He was stoopin' over him and stabbin' him in the back.
...
Q      Eventually did he stop stabbing Mr. Curtis?

A      When Mr. Curtis stopped movin' he stopped stabbin' him.

Tr. Transcript at 920-22.

a prolonged struggle, multiple wounds, or repeated blows as support for an inference of deliberation). The circumstances of Curtis's murder provide sufficient proof of deliberation as defined by Missouri law to support a first-degree murder conviction. Accordingly, the Missouri Supreme Court's decision that sufficient evidence was produced at trial for a reasonable jury to find the element of deliberation beyond a reasonable doubt, is not contrary to, nor an unreasonable application of, clearly established federal law. Petitioner's first claim is denied.

### Claims 2 & 13: Prosecutor's Misconduct on Closing Argument

Petitioner contends that statements made by the prosecutor in closing argument, during both the guilt phase (claim 2) and the penalty phase (claim 13), were prejudicial to him and made his trial fundamentally unfair. Habeas relief may be appropriate if a prosecutor's improper closing argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). The Eighth Circuit has applied this test for examining closing arguments in both the guilt phase and the penalty phase of the trial. See Kinder v. Bowersox, 272 F.3d 532 (8th Cir. 2001); Copeland v. Washington, 232 F.3d 969, 974 n.2 (8th Cir. 2000).

Petitioner must first show that the prosecutor's statements were improper.

United States v. White, 241 F.3d 1015, 1023 (8th Cir. 2001). Second, a court

should: "(1) Measure the type of prejudice that arose from the argument, (2)

examine what defense counsel did in his [or her] argument to minimize prejudice;

(3) review jury instructions to see if the jury was properly instructed; and (4)

determine if there is a reasonable probability that the outcome of the sentencing

phase would have been different, taking into account all the aggravating and

mitigating circumstances." Weaver v. Bowersox, 438 F.3d 832, 840 (8th Cir.

2006) (citations omitted), cert. dismissed as improvidently granted, 127 S.Ct. 2022

(2007).

During closing argument, "an attorney's role is to assist the jury in

analyzing, evaluating and applying the evidence. Arguments that transcend such

boundaries are improper." United States v. Beckman, 222 F.3d 512, 527 (8th Cir.

2000). "A prosecutor may not express a personal opinion about a defendant's

veracity." White, 241 F.3d at 1023. Instead, a prosecutor must base his comments

on "the evidence and the reasonable inferences that may be drawn from it." Id.

These limitations, however, do permit the prosecutor to state his or her argument

regarding the conclusions that the jury should draw from the evidence. United

States v. Segal, 649 F.2d 599, 604 (8th Cir. 1981) (internal citations omitted).

Defense counsel did not object to any of the multiple statements made by

the prosecutor that Petitioner now claims were improper and prejudicial. When

reviewing allegedly improper statements made during closing that were not

objected to by defense counsel, the Court will grant relief only in exceptional

circumstances. United States v. Robinson, 110 F.3d 1320, 1326 (8th Cir. 1997)

(citations omitted). "Defense counsel heard the alleged misconduct and was in a

far better position to judge its significance to the trial than an appellate court

reading a cold transcript. The trial court also heard the alleged misconduct and

likewise was in a better position to judge its significance." James v. Bowersox,

187 F.3d 866, 869 (8th Cir. 1999). Because of the strict due process standard of

constitutional review, the deferential review mandated by the AEDPA, and this

Court's less reliable vantage point for gauging the impact of closing argument on

the overall fairness of a trial, habeas review of a prosecutor's closing argument

should be exceptionally limited. Id.

Claim 2: Prosecutor's Guilt Phase Closing Argument

Petitioner alleges that during the guilt phase of closing argument the

prosecutor improperly expressed personal opinion, inflamed the emotions of the

jury, personally attacked him, violated the presumption of innocence, misstated the

evidence, and made emotional appeals for the jury to protect society. After noting

that none of these claims were preserved for direct appeal by a timely objection at

trial, the Missouri Supreme Court found no error of law and summarily rejected

the majority of Petitioner's claims.  Cole, 71 S.W.3d at 170.  The state court

discussed the merits of only one statement made by the prosecutor (calling the

Petitioner a "convicted killer"), but still found no error of law.  While I agree with

Petitioner that the statements were improper, I agree with the state court that there

was no due process violation.

The first comment came during the State's initial remarks on closing:

May it please the Court, Ms. Hirzy, ladies and gentlemen of the jury, I
want to thank you for your time because this is one January 15th of
2001 and you're spending it here with us and just like you spent the
last week you are giving us your most valuable asset, however, *I can't
think of a case that could be more important to the people of St. Louis
County* and to the family of Anthony Curtis and to the family of Terri
Cole and Terri Cole herself and the case that you've heard here over
the last week.  As you reflect back on the evidence and you think
about the evidence that you heard in this case, I can't emphasize
enough to you the seriousness of this case nor can I emphasize
enough to you the strength of the State's case.
...
Don't think that there aren't people in the world who wouldn't sneak
around at night, put a jack in their car in the morning, probably along
with some other weapons, don't think there aren't people sneaking
around at night, come around the back of the house, enter the house
with a jack, an explosion, and that explosion was to terrorize, walk
into the house and when given the chance to leave, attack and when
given another chance to leave when a man's down, attack again to kill
and then when you are finished with that, turn on a disarmed woman.
...
He sneaks around at night.
He creepy crawls at night, creepy crawls around the house.

...
They're so absorbed and an attacker, a convicted felon with priors, is sneaking around at night, smashing windows with a jack.

Tr. Transcript at 1415-21.  The other two statements about which Petitioner

complains were made by the prosecutor in the rebuttal portion of his closing:

What we do know is his actions are deliberate.  When she says it's ludicrous, maybe it is to you and me.  To him it's deliberate.  He's not an imbecile but he's not a rocket scientist.  *People sitting in that chair (indicating), ladies and gentlemen, are usually there for a reason.*  They may not be a rocket scientist, they are deliberate and calculating and do the best they can with the mayhem they create. . . .

When you can think about the sheer violence of this crime, we know he's a convicted felon, we know he's destroyed evidence and runs, you think he's not going to lie to you.  The Defendant is presumed to be innocent.  That does not mean he's presumed to be truthful. . . .

Do not forget that he lied when you look at this case.  Don't think somebody who killed wouldn't come in and lie.  I'm going to ask you to think about two worlds have collided.  Anthony Curtis, a tour guide from the museum.  You can take that picture of Terri Cole. It shows her after the attack.  She's Marcus' mom.  She's Anthony's mom.  She's a mom who worked for a health company doing clerical work and *he's a convicted killer*.  He wants to make her into an attacker and they were sitting in the house with an alarm. . . .

There are so many atrocities in this world we can't change. This is your day to do something about crime, this is your day to do something about what he did and it's your day for everybody like this, it's also a message to send to the victims of crime, families in St. Louis County, that you can come to the court house and get justice. Juries are not going to believe people with absurd and stupid evidence after they've committed horrible, violent crimes.  I'll ask you this: If not him, who?  If not now, when.  Don't tell Terri Cole, a

dying woman, by your verdict that she is a liar.  You give the Curtis family and Anthony Curtis the justice they deserve.

Tr. Transcript at 1474-80.

### (A) 'More important to the people of St. Louis County' statement

When this statement is read in context, it is not prejudicial and as a result, it did not cause unfairness to infect the trial.  Although it is generally improper for a prosecutor to state his personal opinion to the jury, this statement was made in the opening part of the prosecutor's argument and immediately followed his expression of appreciation to the jury for their time spent hearing the case.  The prosecutor expressed his opinion on the importance of the case to the victim's family as well, not just to the people of St. Louis County.  Reading the closing argument as a whole, it is not probable that the jury would have considered this as referring to evidence not in the record.  Nor did the prosecutor's statement rise to the level of urging the jurors to protect society and community values.  Reasonable jurors would interpret this statement to mean that their time spent hearing the case was well-spent because the outcome of the case matters and the issues they must decide are serious.[2]

---

[2]  Petitioner argues that "if the prosecutor meant to say that first-degree murder cases are, by nature 'serious,' he could have simply said it."  As explained by the Supreme Court, an attorney's closing argument is not always delivered as eloquently as planned:

[C]losing arguments of counsel, are seldom carefully constructed in toto before

Additionally, multiple cases have found no due process violations where a prosecutor had expressed an opinion stating or implying that the defendant was guilty.  See Donnelly, 416 U.S. 637, 640 (1974); United States v. Splain, 545 F.2d 1131, 1134 (8th Cir. 1976).  Although the statement in this case includes the prosecutor's personal opinion on the importance of the case, that opinion is less likely to be prejudicial than a statement of personal opinion regarding the culpability of the defendant.

## (B) 'There for a reason' statement

The prosecutor's argument that "People sitting in that chair ... are usually there for a reason" was improper.  The statement questions the presumption of innocence that is essential to the foundation of our legal system.

This statement is similar to one made by the prosecutor in Splain:  "We are trying to convict Bobby Splain because he committed a crime and we are convinced of that or we wouldn't be trying him."  545 F.2d at 1134.  In Splain the Eighth Circuit found that the defendant's rights were not adversely affected by the

---

the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear.  While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

Donnelly, 416 U.S. at 646-47.

prosecutor's comments.  Id. at 1136.  The statement made in Splain was more

prejudicial than the one made in this case.  In Splain, the prosecutor not only

suggested that the defendant was guilty simply because he was being tried, as is

the case here, but he also stated the opinion of U.S. Attorneys Office in that they

were "convinced" of defendant's guilt.

In this case, despite the implications of the prosecutor's statement, he did

remind the jury of the presumption of innocence standard regarding the Petitioner.

See Tr. Transcript at 1477 ("The Defendant is presumed to be innocent.").  He also

repeatedly told the jury that the burden of proof is with the State.  See id. at 1419

("They set forth the elements that the State must prove beyond a reasonable doubt

for each offense"); id. at 1437 ("I have the burden of proof ..."); id. at 1466 ("We

have got the burden of proof ...").

It is a fundamental principle of our justice system that a defendant is

presumed innocent until proven guilty.  While the prosecutor's misconduct cannot

be disputed, I do not find that the prosecutor's statement infected the Petitioner's

trial with unfairness, when the argument is considered as a whole.

### (C) 'Convicted killer' statement

The State admits that this statement was factually wrong.  Petitioner was not

a "convicted killer" before the jury decided this case.  The State argues, however,

that the statement did not prejudice Petitioner.  The Missouri Supreme Court

concluded that the remark was not prejudicial:

> Appellant argues that during the guilt-phase closing argument, the
> prosecutor committed prejudicial misconduct by making an erroneous
> propensity argument.  While the prosecutor was challenging the
> credibility of the Appellant and his version of the events taking place
> on the night of the murder, he made several references to the
> Appellant being a convicted felon.  Refuting Appellant's claims that
> it was Terri who was the attacker and not the Appellant, the
> prosecutor also stated, "She's a mom who worked for a health care
> company doing clerical work and he's a convicted killer."

> Appellant had testified at trial and, consequently, his prior
> offenses, including two felony convictions for unlawful use of a
> weapon and a violation of an adult abuse order, were properly
> admitted into evidence.  Appellant contends, however, that the
> prosecutor's earlier reference to the actual prior offenses, and the later
> erroneous statement about being a convicted killer, were used
> improperly to show propensity, i.e., prior guilt being used to establish
> guilt of the current offense charged.

> Allegedly improper comments made by the prosecutor that are
> not preserved for review by a timely objection will be reviewed only
> for manifest injustice under the plain error rule, rule 30.20.  "To
> prevail on plain error review, [Appellant] must show that the trial
> court's error so substantially violated his rights that manifest injustice
> or a miscarriage of justice results if the error is not corrected."  While
> it is improper to use prior convictions as substantive evidence of guilt
> or a defendant's propensity to commit crimes, it is permissible to use
> them to attack the defendant's truthfulness and credibility in his
> testimony.

> The prosecutor's statements referencing Appellant's prior
> convictions were properly admitted to attack the Appellant's
> credibility.  The misstatement by the prosecutor referring to the

Appellant as a "convicted killer" was a single inadvertent remark not prejudicing Appellant because the jury had already been presented with the precise nature of his actual prior convictions, none of which involved a homicide. Statements made in closing argument will rarely amount to plain error, and any assertion that the trial court erred for failure to intervene sua sponte overlooks the fact that the absence of an objection by trial counsel may have been strategic in nature.

Cole, 71 S.W.3d at 170 (footnotes omitted).

I conclude that this is not an unreasonable determination. Based on the prosecutor's earlier use of "convicted felon" to describe Petitioner, it is reasonable to believe that he simply misspoke. Furthermore, although the conduct of the prosecutor in making this statement is improper, it was not sufficiently grave to affect the fairness of the trial.

The Eighth Circuit has stated its strong disapproval of the use of epithets by attorneys in closing argument. James, 187 F.3d at 870. But the question to consider when such remarks are used is "whether the jury has the common sense ability to put aside a particular type of overzealous advocacy with the help of the court's standard instruction that arguments of counsel are not evidence." Id. The jury was instructed at the outset of the trial that the attorneys' statements, remarks, and arguments must not be considered as evidence. Such an instruction "alleviate[s] the risk of any prejudicial impact." Robinson, 110 F.3d at 1326.

Petitioner argues that it is even more likely that prejudice resulted from the prosecutor's misstatement because the prosecutor's closing contained numerous references to other bad acts Petitioner committed. Petitioner cites multiple passages from the prosecutor's closing where he negatively describes actions of the Petitioner. <u>See</u> Tr. Transcript at 1415-16, 1421, 1427-28. For example, the prosecutor describes Petitioner as a "convicted felon with priors, [who] is sneaking around at night." Tr. Transcript at 1421. But, during Petitioner's testimony at trial, he admitted to having prior felony convictions and to sneaking around at night. Tr. Transcript at 1290, 1328. The prosecutor also describes Petitioner's actions of putting the jack in his car on the morning of the incident, coming around to the back of Terri Cole's house, and using the jack to shatter the patio door. Tr. Transcript at 1415-16. Again, Petitioner admitted to these actions during his testimony. Tr. Transcript at 1297, 1302. True statements are proper argument and they do not increase the likelihood of prejudice occurring from a totally separate, erroneous misstatement by the prosecutor. As for Petitioner's complaints about the prosecutor's use of the words "mean" and "liar" to describe him, the instructions to the jury prevented any prejudice from those epithets, even if they were improper.

Petitioner argues that the most egregious of the prosecutor's acts was when

he took advantage of Terri Cole's terminal ALS and inflamed and emotionally appealed to the jury by calling Terri a "dying woman," along with other references to her impending death.[3] I agree with Petitioner that mention of Terri Cole's death was not relevant to the decision before the jurors. However, the fact that Terri Cole had ALS was evidence already before the jury. Tr. Transcript at 910, 953. It is not unreasonable to believe that the jurors knew the seriousness of the disease, especially once defense counsel suggested a terminal prognosis. Tr. Transcript at 953. Although it was improper for the prosecutor to make emotional appeals to the jury, Petitioner's trial was not unfair as a result.

Both this statement and the "there for a reason" statement were made in the rebuttal portion of the prosecutor's closing argument. Petitioner argues that this fact makes the statements more damaging because the defense had no opportunity to respond. Generally this is true. See United States v. Cannon, 88 F.3d 1495, 1503 (8th Cir. 1996) ("Because the remark came during rebuttal arguments, defense counsel was unable to respond *except by objection*." (emphasis added)). But this distinction alone is not sufficient to cause unfairness rising to the level of

_____

[3] After the incident at issue, but before the trial in this matter, Terri Cole was diagnosed with Amoyotrophic Lateral Sclerosis (ALS) or Lou Gehrig's Disease, a progressive and ultimately fatal neurological disease. This disease has no connection to the injuries Terri Cole suffered during the incident at issue.

a due process violation.

Certainly, no court can condone the prosecutor's arguing his personal opinion, making suggestions of guilt based on indictment alone, or misstating the evidence. However, these statements were isolated remarks in the midst of over thirty-five pages of closing argument from the prosecutor. They do not constitute pronounced and persistent misconduct of the type that fatally infects a trial with unfairness. In light of the lack of objections to any of the statements by defense counsel, the instructions given by the trial judge, and the strong evidence of guilt against the Petitioner, I conclude that the prosecutor's remarks did not make Petitioner's trial unfair. Accordingly, the Missouri Supreme Court's denial of this claim was not contrary to, or an unreasonable application of, federal law.

### Claim 13: Prosecutor's Penalty Phase Closing Argument

Petitioner argues that many passages from the prosecutor's penalty phase closing argument improperly appealed to the jurors' patriotic duty and asked them to send a message, used inflammatory rhetoric and compared the relative worth of Petitioner's life to the lives of the victims, and improperly used invectives aimed at the Petitioner. The State argues that claims related to most of the passages are procedurally barred because Petitioner did not fully exhaust his state court appeals. In reply, Petitioner does not discuss his failure to exhaust on most of the

passages,[4] but he does argue that his exhaustion of the "patriotic duty" statements should qualify as exhaustion as to the "send a message" statements because of the similarity of these statements' intent and effect.

The portions of the prosecutor's closing argument that Petitioner argues are prejudicial for containing "patriotic duty" and "send a message" statements, are as follows:

> When we talk about deterrents your verdicts do send a message. And, unfortunately, in the world we live in today with the crime that we've seen even over the last couple of years, the violent crime, it's unfortunate but the cold, hard reality is that the death penalty is a weapon we need to have in our arsenal.
>
> I tell you what. If it makes one person think twice, if it makes one person think twice before they point a gun at somebody, if it makes one person think twice before they stab someone repeatedly, it has deterrent value. If there's one person out though [sic] who's gettin' ready to pull his gun out when he's on the street one night and he considers the consequences, it has deterrent value. And jury verdicts do send messages. The reality of the world we live in the death penalty is a weapon we need to have in our arsenal to fight crime. And sometimes you as a St. Louis County jury are the last line of defense.
> ...
> I'll ask you to consider this: I'm not saying what you need to do. And you all told me you could consider it and give it realistic consideration after you've heard all the evidence, and that's what I'm

---

[4] Petitioner does not address the State's argument that he has failed to exhaust claims concerning passages of the closing which he states contain "Inflammatory rhetoric and comparative worth arguments" and "Improper Invectives and Opinions." Nor does Petitioner attempt to demonstrate cause and prejudice to explain his failure to exhaust. These claims are procedurally barred and will not be addressed further.

asking to you do now. I'm not trying to tell you this is easy. I'm not telling you it's gonna be nice. *But I'll tell you there have always been times in our society when citizens, patriots, from time to time have stepped up and done the things that need to be done to protect society.* It's unfortunate but sometimes it happens.

That's what needs to be done in this case.

Tr. Transcript at 1653-54 (Petitioner's emphasis).

The test is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden</u>, 477 U.S. at 181. Despite the same test applying to guilt-phase arguments, a more searching review should be done of the penalty-phase arguments. <u>See</u> <u>Kinder</u>, 272 F.3d 532; <u>Copeland</u>, 232 F.3d at 974 n.2 ("if there is any distinction between guilt and penalty phase arguments, it would seem that there should be a more searching review of the penalty phase").

Petitioner has not met his initial burden of proving that either the "send a message" or the "patriotic duty" statement is improper. Although the statements may fall into categories similar to those found to be improper in <u>Weaver v. Bowersox</u>, the statements here were not similarly egregious or prejudicial.[5] In <u>Weaver</u>, the prosecutor used a graphic story from a movie to analogize the jurors

---

[5] Unlike in this case, defense counsel in <u>Weaver</u> objected to the statements made by the prosecutor as improper on the grounds that they were intended to inflame and prejudice the jury. 438 F.3d at 836.

to soldiers with a duty to kill.  438 F.3d at 836.  The Eighth Circuit emphasized

that because the prosecutor used an analogy to soldiers, who "have no choice but

to kill" and are "follow[ing] orders when they kill," the prosecutor improperly

"eviscerate[d] the concept of discretion afforded to a jury as required by the Eighth

Amendment."  Id. at 840 (citation omitted).  The court found the prosecutor's

statements improper because they were "diametrically opposed to the requirement

that capital sentencing be at the jury's discretion" and because they "diminished

the jury's sense of responsibility for imposing the death sentence."  Id. (quoting

Antwine v. Delo, 54 F.3d 1357, 1361 (8th Cir. 1995)).  The same cannot be said

about the statements made by the prosecutor in this case.  The prosecutor may

have called the jurors "patriots," but such a term does not carry the same

connotations as "soldiers."[6]  Patriots may have a duty of loyalty to their country

and a duty to uphold the law, but not to kill.  Nothing in the prosecutor's

statements insinuated that the jurors lacked the discretion to decide whether to

impose a sentence of death.

     Petitioner also relies on the Weaver court's disapproval of the prosecutor's

---

[6] I find the facts of Viereck v. United States, 318 U.S. 236 (1943), in which the Supreme Court found statements in the prosecutor's closing to be prejudicial, equally inapplicable here. Similar to Weaver, the statements in Viereck concerned war and a duty to perform.  Analogies to war and to soldiers are not comparable to the prosecutor's brief reference to the jurors here as patriots.

argument that a death verdict was necessary to "sustain a societal effort as part of the 'war on drugs.'" 438 F.3d at 840.  The Eighth Circuit held that those arguments violated the Eighth Amendment's requirement that capital sentencing be an individualized decision-making process.[7]  Arguing that one case verdict will signal or affect other cases can prevent an individual determination of the appropriate punishment.  Id. at 841.  In this case, however, the prosecutor suggested that the death penalty is a weapon that can be used to send a message concerning increasing violent crime.  A plain reading of the prosecutor's statements, within the context of his entire closing, suggests that he was trying to emphasize the reasons why our society has the death penalty as punishment and why that punishment was appropriate for this case.  His statements did not violate the Eighth Amendment's individual determination requirement.

---

[7]  Excerpts from the prosecutor's arguments in Weaver that emphasize his focus on an non-individualistic decision by the jury include:

You've got to look beyond [the defendant].  This isn't personal.  This is business.  You people represent the entire community.  You represent society.  You have to give a message here.
...
This case - I guess it's the one that just cries out to you to say protect the community.  The drug dealers, they are taking our streets away from us.
...
And I'm going to beg you for the entire community and for society not to spare his life.  I'm going to beg you for the right message instead of the wrong message.

438 F.3d at 836-37.

In addition, these statements by the prosecutor do not improperly express his personal opinion, nor was he telling the jurors to base their verdict on something other than the evidence before them. Unlike other cases where the prosecutor's statements are potentially improper and the case for the death penalty is weak, the jury found two aggravating and no mitigating factors here. The case for death was not weak. When considered in context of the prosecutor's lengthy closing argument, the impact from these statements is not likely to have been significant or persistent. See Copeland, 232 F.3d at 972, 975 (improper remarks in a "brief" prosecution closing were the core of the closing and formed the crux of the argument for imposing death); Newlon v. Armontrout, 885 F.2d 1328, 1338 (8th Cir. 1989) (finding the prosecutor's improper remarks neither isolated nor ambiguous). There is no reasonable probability that the prosecutor's statements fatally infected the trial with unfairness or affected the outcome of the penalty phase. Accordingly, the Missouri Supreme Court's denial of this claim was not contrary to, or an unreasonable application of, Supreme Court precedent.

### Claims 3 & 14: Ineffective Assistance of Counsel for Failing to Object to Prosecutor's Closing Argument

In his third and fourteenth claims, Petitioner alleges that his trial counsel provided ineffective assistance by failing to object to the closing argument

statements discussed above.[8]  To establish such a claim, the Petitioner must show that his trial counsel did not perform to the degree of skill of a reasonably competent attorney, and as a result, the Petitioner was prejudiced.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  Under Strickland, the Petitioner must first identify specific acts or omissions made by counsel that "were outside the wide range of professionally competent assistance."  Id. at 690.  Second, the Petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  Failure to satisfy either of these prongs is fatal to the claim.  See Pryor v. Norris, 103 F.3d 710, 713 (8th Cir. 1997).  For alleged errors during the penalty phase, Petitioner must demonstrate that there is a reasonable probability that absent counsel's inadequate representation, the jury would not have sentenced him to death.  Kenley v. Armontrout, 937 F.2d 1298, 1303-04 (8th Cir. 1991).

The Court in Strickland cautioned that "judicial scrutiny of counsel's

_____

[8] Just as the majority of the statements to which Petitioner objected to in claim 13 were procedurally barred for failure to exhaust state remedies, any ineffective assistance of counsel claims based on those statements are also barred.  Petitioner attempts to demonstrate cause and prejudice for failing to raise ineffective assistance claims as to the procedurally barred prosecutor's statements by blaming post-conviction counsel for failing to preserve those claims. Ineffectiveness of post-conviction counsel cannot be cause because there is no constitutional right to effective post-conviction counsel.  Sweet v. Delo, 125 F.3d 1144, 1151 (8th Cir. 1997). My ruling on claim 14 is only in relation to the non-procedurally barred statements of the prosecutor that were discussed on the merits in claim 13.

performance must be highly deferential." Further, when measuring the reasonableness of an attorney's acts or omissions at trial, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689.

The Missouri Supreme Court applied Strickland to reject these claims. Cole, 152 S.W.3d at 268-69. On direct appeal the court noted that it found no error of law regarding the prosecutor's statements during the guilt phase, and therefore found counsel was not ineffective for failing to object to them. Id. at 269. Similarly, the Missouri Court rejected Petitioner's claim concerning the "patriotic duty" argument:

> Appellant also contends that the prosecutor made an improper emotional appeal to the jurors during the penalty phase closing argument when stating, "There have always been times in our society when citizens, patriots, from time to time have stepped up and done the things that need to be done to protect society." Appellant claims that this statement improperly implied that the jurors would be shirking their duty as patriots if they did not deliver the death penalty. Trial counsel did not object, and allegedly improper comments made by the prosecutor not preserved for review by a timely objection are reviewed only for manifest injustice under the plain error rule.

> The jury was statutorily required to objectively find the presence of at least one statutory aggravator beyond a reasonable doubt to impose the death sentence. Appellant provides no evidence that the jury was subjectively prejudiced by the prosecutor's

statement. The jury found the presence of two statutory aggravators beyond a reasonable doubt, and when this Court independently conducted its proportionality review during Appellant's direct appeal, the Court concluded there was "no evidence to suggest that the punishment imposed was a product of passion, prejudice, or any other arbitrary factor."

Id. (footnotes omitted).

Petitioner has failed to show that the result of either phase at his trial would have been different had counsel objected. Moreover, defense counsel is not ineffective for failing to make a meritless objection. See Carter v. Hopkins, 92 F.3d 666, 671 (8th Cir. 1996). Trial counsel's lack of a strategic reason for failing to object is irrelevant. The Missouri Supreme Court's holding was not an unreasonable application of Strickland or any other clearly established federal law. Petitioner's third and fourteenth claims are denied.

## Claim 4: Striking of Veniremember Chambers

Petitioner argues that the prosecutor's use of a peremptory challenge to strike veniremember Vernard Chambers from the jury violated Batson v. Kentucky, 476 U.S. 79 (1986). Batson held that the Equal Protection Clause of the United States Constitution prohibits using peremptory challenges to exclude jurors on the basis of race. Id. at 89. The court uses a three-step process for evaluating whether the use of a peremptory challenge was based on purposeful

discrimination. First, the defendant must make a prima facie case of racial

discrimination. Second, after such a showing is made, the State must suggest a

race-neutral explanation for the use of the strike. Third, after a race-neutral reason

is offered, the trial court must decide whether the defendant has shown purposeful

discrimination. <u>Snyder v. Louisiana</u>, 128 S. Ct. 1203, 1207 (2008); <u>Purkett v.

Elem</u>, 514 U.S. 765, 767 (1995); <u>United States v. Jones</u>, 245 F.3d 990, 992 (8th

Cir. 2001).

During Petitioner's trial, after defense counsel made the <u>Batson</u> challenge to

the strike of veniremember Chambers, the prosecutor offered the following

reasons for why the strike was race-neutral:

> In general terms Mr. Chambers – the State's primary concern with
> Mr. Chambers is that he is divorced. And because of the facts and the
> dynamics of case – the record should reflect the State expects that the
> evidence that's introduced will show that Mr. Cole was divorced from
> his wife Terri Cole. There was a great deal of animosity between the
> two of them. I'm concerned that someone who is similarly situated to
> Mr. Cole in that he's divorced may be sympathetic to Mr. Cole and
> may not be sympathetic to Terri Cole, the victim in this case.
>
> My primary concern is I think sometimes when people are
> divorced there is a great deal of animosity that flows back and forth
> between the two parties. And I'm afraid Mr. Chambers would
> sympathize with the Defendant here and maybe give Terri Cole a
> degree of scrutiny that I'm not sure I want to be given to her in this
> case.
>
> In addition to that, Your Honor, with regard to the death

penalty he stated that he was not opposed to the death penalty, but not sure if he could do it or not.

Furthermore, he has a cousin doing life in prison for a murder in Michigan.

I will say this: I would like the record to reflect that Mr. Chambers – I like Mr. Chambers. He was a juror in a case that I tried in Division 11, State versus Leo McLaughlin. He was a juror where a young man was charged with tampering with a victim in a felony murder prosecution or tampering with a witness, I should say, a Class C felony. And he was part of a jury that returned a verdict sentencing that Defendant, a young man, to 4 years – or they recommended a sentence of 4 years in the Missouri Department of Corrections and a fine.

I found that to be a good State's oriented jury. But I'm very concerned about the fact that Mr. Chambers is divorced. And that's why I'm striking him.

Tr. Transcript at 569-71. Defense counsel responded that there was a white male paying child support and a different white male who was never married, neither one of which was struck by the State. She also generally objected to Chambers being struck on the basis of his divorced status. Tr. Transcript at 571. The trial court denied the defense's <u>Batson</u> challenge and stated: "I find that the State's reasons for striking Mr. Chambers . . . are race neutral reasons. Not done for the purpose of biasness on the part of his race." <u>Id.</u> at 571.

The Supreme Court of Missouri found the prosecutor's reasons to be race neutral and not pretextual:

Contrary to Appellant's assertions, the two venire persons cited as being similarly situated with regard to marital status were not divorced, but had not married. The prosecutor was justified in being concerned over the animosity that may develop between divorced spouses and the sympathy Chambers may have shown Appellant.

With regard to Chamber's ability to impose the death sentence, in addition to the statement previously cited [assuming the Appellant was unanimously found guilty he could sign a death verdict "Because that says I've also agreed that that's the right thing to do"], he made the several other conflicting statements. When initially asked if he could consider a death sentence he stated, "I honestly don't know," and "I don't know whether I could or not." Only under repeated questioning, when presented with the assumption of the defendant being found unanimously guilty, did Chambers indicate that he could sign a verdict form awarding the death penalty.

A white venireperson having a nephew in prison for manslaughter and Chambers having a cousin serving life for murder are not comparative equivalents. While both venirepersons indicated they could try this case without being influenced by these experiences, only Chambers indicated that he had formed an opinion about the prior case. Chambers indicated that from speaking with family members that his cousin "got what he deserved."

Marital status, hesitancy regarding imposing the death penalty, and having a family member in prison have all been determined to be race-neutral reasons for making peremptory strikes. Considering the totality of the circumstances as required, including Chambers's status as a divorcee, his inconsistent statements about his ability to impose the death penalty, and his opinion concerning the murder case involving his cousin, Appellant did not demonstrate that the prosecutor's explanation was pretextual in nature. The trial court did not erroneously validate the peremptory challenge to exclude Chambers from the jury panel.

Cole, 71 S.W.3d at 173 (footnotes omitted). Four years following this ruling on

direct appeal, Petitioner filed a motion to recall the mandate in the Missouri

Supreme Court.  The motion requested that the court reconsider its ruling on this

claim in light of intervening authority from both the United States and Missouri

Supreme Courts.  The motion was summarily denied.

In <u>Snyder v. Louisiana</u>, 128 S.Ct 1203 (2008), the Supreme Court refused to

provide any deference to the trial court's determination of a <u>Batson</u> challenge

because the judge gave no explanation for why he overruled the objection.  128

S.Ct. at 1208-09.  The Eighth Circuit has interpreted <u>Snyder</u> narrowly, and has

pointed out that a habeas court must give deference not only to the trial court's

findings, but also to the determinations of the appellate court.  <u>See</u> <u>Smulls v.</u>

<u>Roper</u>, 535 F.3d 853, 860 (8th Cir. 2008) (en banc).  Applying the required

standards, I conclude that this claim for habeas relief must be denied.  Even if I

examine the decision of the Missouri Supreme Court for correctness, as well as for

reasonableness, I conclude that there is no basis for relief.[9]

I will assume, without deciding, that Petitioner has established a prima facie

---

[9] The trial record here reveals a disappointing lack of findings or evidence that the trial judge conducted a proper <u>Batson</u> evaluation.  Defense counsel made the <u>Batson</u> challenge to the strike of veniremember Chambers and the prosecutor offered his race-neutral reasons.  Defense counsel then challenged the State's arguments and the trial judge denied the <u>Batson</u> challenge by simply stating that the reasons provided were race neutral.  Thus, a less deferential review may be appropriate, although, unlike <u>Snyder</u>, the prosecutor did not rely on demeanor arguments that do not appear in the record.

showing of purposeful discrimination sufficient to shift the burden to the State to provide a racially-neutral explanation for its peremptory strikes. The prosecutor offered three reasons for striking Chambers: (1) Chambers' divorced status, (2) Chambers' hesitation about being able to impose the death penalty, and (3) Chambers' cousin was serving a life sentence for murder in Michigan.

The State's "primary concern" with Chambers was his divorced status. The prosecutor explained that animosity often develops between divorced parties and given that the Petitioner and victim Terri Cole were divorced, he thought it was important to strike Chambers from the jury. Petitioner argues that this reason is pretextual because the prosecutor failed to ask any follow-up questions of Chambers concerning the circumstances of his divorce, whether animosity existed between the parties, and if such animosity would affect the trial. According to an affidavit from veniremember Chambers, if follow-up questions had been asked of him he would have told the prosecutor that there was no animosity between himself and his ex-wife. Petitioner also argues that the prosecutor failed to question a white juror who paid child support, demonstrating a contradiction between the State's theory of the case and its use of peremptory strikes.

In voir dire, the prosecutor asked the whole panel for a show of hands as to who was not currently married and had been divorced at one time. Veniremember

Chambers was the only person on the panel to raise his hand. Before this question, the prosecutor asked who was married and after this question he asked about who was paying child support. Tr. Transcript at 446-47. Although the prosecutor did not follow up his query on who was currently divorced with further questioning, it is a legitimate assumption that animosity could have arisen from a divorce and that such emotional feelings could affect a juror's decision.

One of the basic facts of this case was that Petitioner and victim Terri Cole were divorced. The obvious hostility that existed between Petitioner and Terri Cole leading up to the crime at issue was fundamental to the State's case. Although the State did not strike a veniremember who admitted to currently paying child support, the parties were not similarly situated in terms of marital status. Tr. Transcript at 446-47. Chambers, as a person who was divorced and not remarried, was more like Petitioner than was a juror who had been divorced but had remarried. Counsel certainly could have asked further questions, but I cannot say that the lack of follow-up questions means the strike was improper. Other courts have found marital status to be a non-racial reason for striking a juror even when the case did not involve a contentious and bitter divorce. See United States v. Martinez, 168 F.3d 1043, 1047 (8th Cir. 1999); United States v. Davis, 871 F.2d 71, 72-73 (8th Cir. 1989) (court affirmed strike of veniremember where prosecutor

argued that an unwed person over the age of thirty was more likely to have problems with commitment and therefore have trouble reaching a verdict).

Petitioner also argues that the prosecutor's other two reasons for striking Chambers – his incarcerated cousin and his qualms about the death penalty – were pretextual. Petitioner suggests that a white veniremember was similarly situated to Chambers in that she had a nephew serving time for manslaughter, and that a different white veniremember was similarly situated in that he had expressed the same initial hesitation as Chambers about the death penalty.

According to the Supreme Court, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." Miller-El v. Dretke, 545 U.S. 231, 241 (2005) (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000)). Deciding whether an explanation is neutral is a question of comparability. "It is well-established that peremptory challenges cannot be lawfully exercised against potential jurors of one race unless potential jurors of another race with comparable characteristics are also challenged." Devose v. Norris, 53 F.3d 201, 204 (8th Cir. 1995) (quoting Doss v. Frontenac, 14 F.3d 1313, 1316-17 (8th Cir. 1994)). Neither veniremember was "otherwise-similar" to Chambers or possessed "comparable characteristics"

because neither was divorced. Because Chambers' divorced status was a non-racial reason for striking him, and no similarly situated white veniremember was allowed to serve on the jury, the prosecutor did not exhibit purposeful discrimination in striking Chambers, and the Batson challenge was properly rejected by the Missouri courts.

Petitioner argues in several supplemental filings and a motion for limited discovery that recent developments in cases arising from St. Louis County demonstrate that the prosecutor's peremptory strikes at Petitioner's 2001 murder trial were race based and not isolated incidents. Petitioner points to comments made by Missouri Supreme Court justices during oral argument on a case involving a Batson claim, State v. McFadden, 216 S.W.3d 673 (Mo. 2007). The justices expressed concern over the volume of Batson challenges originating from St. Louis County and the number of recent rulings reversing cases on the basis of actions by that prosecutor's office in violation of Batson. The recent rulings and remarks by some of the Missouri Supreme Court justices do not change my analysis in this case, nor do they lead me to believe that the Missouri court would decide this case differently if it were reviewing it today. The Missouri court had an opportunity to change its ruling when considering Petitioner's motion to recall the mandate, which it summarily denied on August 22, 2006. Petitioner's claim 4

will be denied.

## Claim 5: Ineffective Assistance of Counsel for Failing to Inform Petitioner of Plea Offer

Petitioner claims that, shortly before trial, the prosecutor made a plea offer of thirty years, but defense counsel never informed him of the offer. According to Petitioner's mother, the offer was made by phone in her presence and she was assured by defense counsel that the offer would be conveyed to Petitioner. However, during the trial court's examination of Petitioner following his sentencing, he stated that he never received a plea offer from the State. Tr. Transcript at 1692. Petitioner argues that his counsel's failure to inform him of the plea offer from the State constituted ineffective assistance of counsel and violated his Sixth, Eighth, and Fourteenth Amendment rights. The State asserts that Petitioner has defaulted on this claim by failing to raise it in any Missouri court. Petitioner did not assert this claim in either his direct appeal, his *pro se* post-conviction relief (PCR) motion, or his amended PCR motion. Petitioner does not address the issue of procedural default and makes no argument concerning this claim in his traverse brief.

It is well-settled that a habeas petitioner must raise both the legal and factual bases for his or her claim in the state courts in order to preserve the claim for

federal review. <u>Flieger v. Delo</u>, 16 F.3d 878, 885 (8th Cir. 1994). Where there has been a procedural default, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991).

Petitioner has offered no arguments to show cause for his default nor has he shown actual prejudice. There has been no fundamental miscarriage of justice. There is no reason why this claim could not have been raised in state court. Petitioner has defaulted on this claim and therefore it is denied.

## Claim 6: Premature Juror Deliberation

In his sixth claim, Petitioner argues that a note received by the trial judge during the penalty phase, but before the jury was released for deliberations, indicates that the jurors had begun deliberating before the close of all the evidence. Petitioner's habeas counsel states that further investigation of this matter suggests that one or more jurors were deliberating early during both the guilt and penalty phases. The State argues that this claim, like Petitioner's fifth claim, is procedurally defaulted because Petitioner failed to raise it in the Missouri courts.

Before filing his amended PCR motion, Petitioner filed a motion in the St. Louis County Court for leave to contact and interview petit jurors.[10]  In this motion, which the trial court denied, Petitioner cited to the trial transcript and argued the same evidence presented to this Court in his habeas petition in support of this claim.  Petitioner's claim is based on a note from Juror No. 4, sent to the trial judge during presentation of penalty-phase evidence and before deliberations, and the trial transcript excerpts which resulted from that note.  The note stated:

> A question to the judge ------
>
> After the trial and after the jury is released, can the members of the jury discuss the details or general nature of the jury deliberations?
>
> Please let me know at the appropriate time.
>
> Juror ------ Brian Hull [Juror No. 4]

The trial judge's response note informed the juror that he would respond on the record and then the following occurred in the courtroom:

> THE COURT:      May I see both counsel at sidebar, please?
>
> (The following proceedings were had at sidebar out of the hearing of the jury:)
>
> THE COURT:      This is a question I received from the foreman

---

[10]  Defense counsel had to seek permission from the trial court to contact the jurors because under a local rule in St. Louis County, Rule 53.3, defense counsel is prohibited from post-verdict contact with petit jurors absent leave of court.

concerning the discussion of general nature of jury before they even deliberate.

They want to discuss -- or he asked a question could they discuss jury deliberations in general?

I'm going to instruct them that I just received a general question from one of the jurors concerning discussion of jury deliberations.  Before you deliberate you cannot talk about this case including discussions regarding deliberations.

MS. HIRZY:        I would agree that's what we have to say.

MR. REILLY:        Thank you, Judge.

(The following proceedings were had in open court:)

THE COURT:        Ladies and gentlemen of the jury, I have received a question from one of the jurors regarding discussing details of a general nature of jury deliberations before you deliberate.

It is not appropriate to have any discussions whatsoever concerning the trial including its deliberations.

So, that's the instructions that I have to give you.

Tr. Transcript 1537-38.  At the end of the trial, after the penalty-phase verdict was read and the jury was polled, Juror No. 4 raised the issue of his note to the judge:

THE COURT:        ... Do you have any questions at this time?  Yes, sir?

JUROR NO. 4:        I wanted to clarify the question I sent up earlier at this point.  Now the ones that are discharged are all deliberations in general and in particular cannot be discussed?

THE COURT:     No.  You can discuss it with anybody you want to.
The deliberations right now.  Or you don't have to talk to anybody
that you do not want to.

In other words, if somebody runs up to you and asked you what
happened during the deliberation, or what did you think about this
case, what do you think about this trial; you can tell them to fly a kite.
If that person has a problem with that, then you call me.  I guarantee
that person won't have a problem.

JUROR NO. 4:     But it's our personal choice; it's not a legal --

THE COURT:     Exactly.  It's your personal choice.

Tr. Transcript at 1662.

Although Petitioner asserts that "[f]urther investigation by habeas counsel

leads them to conclude, on information and belief, that one or more jurors were

deliberating early during the guilt phase as well as the penalty phase," Petitioner

provides no evidence supporting such an assertion.  The only evidence before the

Court in support of this claim is the excerpts from the trial transcript.[11]

Petitioner argues that federal habeas review of this claim is not barred

because he can demonstrate cause for the procedural default of this claim, and

actual prejudice, as required by Coleman v. Thompson, 501 U.S. at 750.

---

[11]  The Court notes that although Petitioner's trial counsel was prohibited from contacting
the petit jurors after denial of its motion requesting such relief, Petitioner's current habeas
counsel is not so prohibited and admits to having contacted jurors in Petitioner's second
supplemental memorandum of law in support of claims 7 and 16.  Despite having access to the
jurors and having contacted at least some of them, Petitioner has provided no evidence in support
of this claim and relies on the trial court transcript alone.

According to the Supreme Court, "cause" for procedural default can be demonstrated by "a showing that the factual or legal basis for a claim was not reasonably available to counsel," or by a showing that some interference by officials "made compliance impracticable." <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986) (internal citations omitted). Petitioner argues that the state court's denial of his motion for leave to contact the petit jurors constitutes "cause" because the denial inhibited any further investigation into this matter and thereby prevented his counsel from being able to effectively raise the claim in his PCR motion. Petitioner has submitted the same evidence in support of the merits of this claim as he submitted in his motion for leave to the St. Louis County court, and therefore the evidence was available to him at the time of filing his PCR appeal. <u>Cf.</u> <u>Williams v. Taylor</u>, 529 U.S. 420, 442-44 (2000) (finding cause for procedural default after investigator revealed new facts demonstrating that a juror lied during voir dire and those facts could have been discovered earlier if state court had allowed motion). Petitioner has not demonstrated cause that would justify the procedural default of this claim. Petitioner could have and should have presented the same arguments to the state courts for review before bringing it before this

Court.  Petitioner's sixth claim is denied.[12]

## Claims 7 & 16: Visible Restraints

In Petitioner's seventh and sixteenth claims for relief, he asserts that the leg brace restraint he was required to wear during his trial was visible to the jurors and that this violated his due process rights, relying on <u>Deck v. Missouri</u>, 544 U.S. 622 (2005).  Claim 7 pertains to the effect of the visible restraint on the guilt phase of the trial and claim 16 pertains to its effect on the sentencing phase.  The State argues that Petitioner has defaulted on these claims because they were not raised in either his direct appeal or his PCR motion, but even despite the default, Petitioner's claims would fail because the leg restraint was not visible and thereby did not violate <u>Deck</u>.  Petitioner argues that these claims are not procedurally defaulted because he raised them in a motion to recall the mandate.

The Missouri Supreme Court affirmed the denial of Petitioner's PCR

---

[12]  The Court notes that even if Petitioner could establish cause for the procedural default, this claim would be denied on its merits because the excerpts from the trial transcript do not suggest that the jurors prematurely deliberated.  It is obvious to me that the trial judge simply misinterpreted Juror No. 4's question and now Petitioner seeks to take advantage of that misinterpretation.  The trial judge summarized Juror No. 4's question to counsel at a sidebar as asking whether the jurors could "discuss jury deliberations in general" at a point in time "before they even deliberate." The note shows however, that the juror was really asking whether he could discuss what was said during deliberations *after the trial was over*.  This interpretation makes more sense given the note's reference to "[a]fter the trial" and when considered in light of the juror's attempt to clarify his question as the jury was being discharged.  Therefore, even if this claim was not procedurally defaulted, I would deny it.

motion on November 23, 2004.  The Supreme Court issued its ruling in <u>Deck v.</u>

<u>Missouri</u> on May 23, 2005.  544 U.S. 622.  Petitioner moved to recall the mandate,

or alternatively, for a writ of habeas corpus pursuant to Mo. Sup. Ct. R. 91, on

August 3, 2005.  In that motion, Petitioner argued:  (1) that the leg restraint that he

was required to wear throughout the trial was visible to all observers in the

courtroom, including the jurors; and (2) that the Supreme Court's recent holding in

<u>Deck</u> forbids the use of physical restraints that are visible to the jury during either

phase of a capital trial.  On August 30, 2005, the Missouri Supreme Court

summarily denied the motion to recall the mandate and denied a writ of habeas

corpus without any legal discussion.

The Eighth Circuit has held that a claim raised in a motion to recall the

mandate is not procedurally barred as long as the motion was properly raised at the

time it was filed in state court and there was no time limit on its filing.  <u>Chambers</u>

<u>v. Bowersox</u>, 157 F.3d 560, 565-66 (8th Cir. 1998).[13]  According to the State,

Petitioner's claim was not properly raised in a motion to recall the mandate

because Missouri Supreme Court Rule 29.15 provides the exclusive procedure by

---

[13]  Petitioner repeatedly cites this case for the holding that claims of ineffectiveness of
appellate counsel were not defaulted when first presented in a motion to recall the mandate.  On
June 20, 1995, Rule 29.15 was amended, effective January 1, 1996, such that claims of
ineffective assistance of appellate counsel must now be raised in the sentencing court.  Many
cases, such as <u>Chambers v. Bowersox,</u> were decided under the old version of Rule 29.15.

which a person may seek relief in the sentencing court for a claim "that the conviction or sentence imposed violates the constitution and laws of this state or the constitution of the United States." Mo. Sup. Ct. R. 29.15(a). A proper Rule 29.15 motion must include every claim known to the movant, and any claims not listed are waived. Mo. Sup. Ct. R. 29.15 (b),(d). When "the decision of a lower appellate court directly conflicts with a decision of the United States Supreme Court upholding the rights of the accused," however, a motion to recall the mandate may be proper. State v. Whitfield, 107 S.W.3d 253, 265 (Mo. 2003) (quoting State v. Thompson, 659 S.W.2d 766, 768-69 (Mo. 1983)). The Eighth Circuit has acknowledged this situation as a permissible circumstance upon which a motion to recall the mandate can be filed under Missouri law. Nave v. Delo, 62 F.3d 1024, 1031 (8th Cir. 1995).[14]

Deck's holding could be viewed to conflict with what Petitioner says happened in his case, and so I believe the claim is not procedurally barred from habeas review. Because the Missouri Supreme Court denied Petitioner's motion to recall the mandate without explanation, the court's action is presumed to be on the merits. Chambers, 157 F.3d at 566. Given this denial on the merits and the

---

[14] Nave was decided based on Missouri Supreme Court Rule 27.26 which was repealed effective January 1, 1988. The Court was aware of the rule change at the time of the opinion and found that the holding would not change with the new Rule 29.15. Id. at 1031 n.6.

fact that the Missouri Supreme Court has recalled its mandate after considering the merits of a new argument based on a recently issued Supreme Court ruling, see State v. Whitfield, 107 S.W.3d at 256, I will consider the merits of Petitioner's claims regarding restraints.

Although these claims are not defaulted, they nevertheless fail on the merits because the evidence shows that the restraints here were far less extensive or visible than those in Deck. It is highly unlikely that any juror was even aware of the leg restraint. Petitioner has submitted affidavits from himself, his mother, and his sister stating otherwise, but the trial record contradicts their characterization of the evidence. Petitioner describes the leg brace as made of a black, cloth-like material and chrome-colored metal. It was fastened to one of his legs with velcro straps and ran from his upper thigh or lower crotch area down to his ankle. According to Petitioner, the restraint limited his ability to bend his knee and made it awkward to walk. Despite the restraints being worn under his pants, Petitioner says that it was easily visible because it could be seen under the bottom of his pant-leg when he was sitting at the defense table. Petitioner's mother and sister also provided affidavits stating that the restraint was visible from the public seating area. In addition, Petitioner's mother described an incident during the trial where Petitioner's counsel pulled him out of his chair and led him to a different

area of the courtroom, during which the jury could have viewed the Petitioner walking with difficulty because of the restraint. Petitioner's sister testified that she recently revisited the trial courtroom to sit in the jury box and confirm that the area under the counsel table was visible to the jurors.

In a supplemental filing in support of his habeas claims, Petitioner included affidavits from two law student interns, working on Petitioner's behalf, who interviewed two jurors. One juror told the interns that he recalled seeing the Petitioner "shackled around his feet" during the trial. The other juror told the interns that she recalled seeing Petitioner "handcuffed when he came in" to the courtroom. I do not believe that these long after the fact recollections – at least one of which is admittedly wrong – causes a question requiring an evidentiary hearing.

"Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." <u>Townsend</u>, 372 U.S. at 312-13. However, a hearing is only required when the facts are not adequately developed in state court and that failure is not attributable to the petitioner. Federal habeas courts apply the cause and prejudice standard to determine whether a habeas petitioner's failure to develop relevant

facts in state court will be excused.  Keeney, 504 U.S. at 11-12.

There is no reason Petitioner could not have raised this issue in state court, where a timely evidentiary hearing could have been held.  Petitioner cannot argue that he did not have an opportunity to raise the issue with the trial court judge because his trial counsel did discuss the leg restraint with the judge during the trial – just not in the context of its visibility.  Petitioner's counsel asked that Petitioner not have to wear the brace because it was uncomfortable.  The trial judge denied the request because of a St. Louis County administrative policy which requires that defendants in custody on death penalty charges wear such a restraint.  Tr. Transcript at 1187-88.  Petitioner cannot prove that the failure to hold an evidentiary hearing in state court was not attributable to himself.  Because he cannot meet the cause and prejudice standard, he is not entitled to an evidentiary hearing.

Moreover, even if part of the restraint were visible it would make no difference here unless the jurors recognized the object as a physical restraint.  The Court will not make that inference, especially given the Petitioner's description of the restraint and a comment made by Petitioner's trial counsel.  During her objection to the restraint based on its uncomfortableness, Petitioner's counsel stated that Petitioner had been wearing the restraint the week before trial and she

thought it was because "his knee was bothering him" so she failed to bring it to the court's attention at that time.  Tr. Transcript at 1187.  This statement demonstrates that even Petitioner's counsel had the restraint confused with some kind of knee support brace.

A knee immobilizer worn under Petitioner's clothing, which Petitioner's own counsel confused with some kind of medical device, is far different from the visible leg irons, handcuffs and belly chain in <u>Deck</u>.  Although one juror wrongly recalled that Petitioner wore leg shackles during the trial, there is not sufficient evidence to show that the jury saw part of the leg restraint sticking out from under Petitioner's pants-leg and recognized it as some sort of physical restraint.  The Missouri Supreme Court's denial of Petitioner's motion to recall the mandate was not contrary to, or an unreasonable application of, federal law.  Petitioner's seventh and sixteenth claims are denied.

## Claim 8: Limits on Petitioner's Opening Statement

Petitioner's eighth claim for relief asserts that his due process rights were violated when trial counsel was not allowed on opening statement to describe the evidence that she expected to elicit by cross-examining the prosecution's witnesses.  The State argues that this claim is procedurally barred because it was not raised in direct appeal or in the PCR proceeding, even though Petitioner did

raise the issue in his motion to recall the mandate.

As discussed above, there are limited circumstances in which a claim is properly brought in a motion to recall the mandate under Missouri law. A motion to recall the mandate is not a proper method of raising a claim of trial error. <u>Sweet v. Delo</u>, 125 F.3d 1144, 1150 (8th Cir. 1997). Petitioner's claim of denial of a full opening statement is a claim of trial error and therefore it is not properly raised in a motion to recall the mandate. Instead, claims of trial court error should be raised under Rule 29.15. Additionally, unlike the restraint claims discussed above, this claim does not allege a conflict with any recently decided United States Supreme Court precedent. Instead, it simply alleges a conflict with the holding of the Missouri Supreme Court in <u>State v. Thompson</u>, 68 S.W.3d 393 (Mo. 2002).

Petitioner could avoid procedural default by demonstrating "cause for the default and actual prejudice as a result of the alleged violation of federal law" or that a "failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. Petitioner has offered no arguments in support of cause for the default and actual prejudice, nor has he attempted to demonstrate a fundamental miscarriage of justice. There is no cause for his failure to raise the claims earlier, so the claim is denied.

## <u>Claim 9: Lack of Aggravating Circumstances in Charging Documents</u>

In Petitioner's final guilt-phase claim, he argues that his right to due process of law and his Sixth Amendment right to notice of the charges against him were violated by the omission of any aggravating circumstances from the charging instruments. According to Petitioner, the State's failure to plead any aggravating circumstances in the indictment or information precludes the state from increasing the punishment for first degree murder from life imprisonment to death.

It is undisputed that none of the first three charging documents – the indictment (filed October 15, 1998), the superceding indictment (filed November 30, 2000), and the information in lieu of indictment (filed December 20, 2000) – contained a list of aggravating factors. However, the State filed a "Notice of Evidence of Aggravation" on September 29, 1999, which contained the three aggravating factors that were eventually included in the jury instructions used at trial.[15]

The Missouri Supreme Court considered this argument on appeal under plain error review and found Petitioner's claim to be meritless:

_____

[15] The jury found two of the aggravators to exist: (1) that the murder involved "depravity of mind" in the form of "repeated and excessive acts of physical abuse upon Anthony Curtis;" and (2) that the murder was committed while Petitioner was engaged in the perpetration of a burglary.

Appellant's argument is based upon the premise that while [Mo. Rev. Stat.] section 565.020 establishes a single offense of first-degree murder, the combined effect of sections 565.020 and 565.030.4 is to create two types of first-degree murder. According to Appellant, the before-mentioned statutes delineate two separate crimes, "unenhanced" first-degree murder, carrying a maximum sentence of life without probation or parole, and "aggravated" first-degree murder, requiring an additional element of at least one statutory aggravator pursuant to section 565.032 and which carries the maximum sentence of death. Appellant claims the failure to include any statutory aggravators in either the indictment or the information necessarily results in Appellant only being charged with "unenhanced" first-degree murder and to assess a sentence of death increases the statutory maximum penalty which was beyond the jurisdiction of the trial judge.

Appellant's claim is meritless. Section 565.020 defines a single offense of first-degree murder with the express range of punishment including life imprisonment or death. Section 565.030 delineating trial procedure in cases of first-degree murder does not create, or differentiate, two separate categories of first-degree murder offenses. The maximum penalty for first-degree murder in Missouri is death, and the required presence of aggravating facts or circumstances to result in this sentence in no way increases this maximum penalty. *Apprendi* is inapposite.

Cole, 71 S.W.3d at 171.

Petitioner's argument is based on the Supreme Court's holdings in Ring v.

Arizona, 536 U.S. 584 (2002) and Apprendi v. New Jersey, 530 U.S. 466 (2000).[16]

_____

[16] Petitioner's claim raised before the Missouri Supreme Court was based on Apprendi alone because Ring was not issued until a few months after the Missouri court's opinion.

In Ring, the Supreme Court held that the Sixth Amendment right to trial by jury guarantees that any aggravating factors or circumstances necessary for imposition of the death penalty must be found by a jury and not by a judge. 536 U.S. at 609. Apprendi was also based on the Sixth Amendment, and held that a jury must decide facts that increased the maximum sentence. 530 U.S. at 490. Neither of these cases directly addressed what details are required in the charging documents. However, Jones v. United States, which formed the basis for Apprendi and Ring did address the issue in the context of a federal prosecution: "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." 526 U.S. 227, 243 n.6 (1999).

Petitioner confuses the constitutional rights guaranteed by the Fifth Amendment and those guaranteed by the Sixth Amendment. The Fifth Amendment indictment clause states that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. The Sixth Amendment guarantees the right to an impartial jury and contains a notice requirement: "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and

cause of the accusation." U.S. Const. amend. VI. Petitioner bases his claim here on the Sixth Amendment and makes no mention of the Fifth Amendment at all. But it is undisputed both that Petitioner had notice of the charged aggravators, and that the jury – not the judge – decided which aggravators apply.

The Fifth Amendment's grand jury indictment requirement only applies in federal courts and is not applicable to the states, either as an element of due process or as a direct command of the Fourteenth Amendment. Hurtado v. People of State of California, 110 U.S. 516, 538 (1884); see also Apprendi, 530 U.S. at 477 n 3; United States v. Allen, 406 F.3d 940, 942 (8th Cir. 2005). In Allen the Eighth Circuit held that Ring, Apprendi and Jones mean that the Fifth Amendment requires capital aggravating factors be included in *federal* indictments, 406 F.3d at 942-43, but that does not help Petitioner here.

Putting aside the Fifth Amendment, since it does not apply to state courts, the Sixth Amendment inquiry is whether the charging documents provided sufficient notice to comply with due process. "Due process requirements are satisfied if a defendant receives actual notice of the charges against him, even if the indictment or information is deficient." Hulstine v. Morris, 819 F.2d 861, 864 (8th Cir. 1987) (citing Franklin v. White, 803 F.2d 416, 417 (8th Cir. 1986)).

Petitioner does not deny that he received the State's 'Notice of Evidence of

Aggravation,' which was filed on September 29, 1999. This Notice listed the three aggravating factors the State argued at trial and was received by Petitioner over a year before the trial. Petitioner provides no specific indication of how the lack of inclusion of the statutory aggravators in the other charging documents could have prejudiced him, and I find no prejudice. Petitioner had sufficient notice and was fully informed of the charges and aggravators that the State planned to pursue against him. The state court's holding on this issue is not contrary to, or an unreasonable application of, federal law. Petitioner's ninth claim is denied.

### Claim 10: Ineffective Assistance of Counsel for Failing to Investigate and Present Evidence that Petitioner Suffered from Extreme Mental and Emotional Disturbance

Petitioner's tenth claim argues that trial counsel failed to investigate and present evidence that he suffered from an extreme mental and emotional disturbance at the time of the crime. Although Petitioner had undergone two pretrial psychiatric evaluations by mental health experts, he argues that counsel should have had him evaluated by a third expert to develop mitigation evidence for the penalty phase. At Petitioner's post-conviction hearing a forensic psychiatrist, Dr. William Logan, opined that Petitioner was suffering from an "extreme mental and emotional disturbance" at the time of the offense – a

mitigating circumstance under Missouri statute.  See Mo. Rev. Stat. §

565.032.3(2).

The Missouri Supreme Court denied this claim, in conjunction with its

denial of Petitioner's eleventh claim, which concerns the failure to discover and

present lay evidence on Petitioner's troubled state of mind, stating:

> With regard to counsel's choice of mental health experts, and the decision not to elicit testimony from other lay witnesses about Appellant's alleged emotional distress, both experts who examined the Appellant concluded that he was not suffering from any mental disease or defect at the time of the crime.  There was no evidence that Appellant was suffering from depression, paranoia or delusional beliefs.  His thought processes were found to be logical and sequential and he was determined to be capable of knowing and appreciating the nature, quality and wrongfulness of his conduct. Defense counsel cannot be found ineffective for failing to shop for a more favorable expert witness.

Cole, 152 S.W.3d at 270 (footnote omitted).

The Strickland standard discussed in claims 3 and 14 above applies to

claims of ineffective assistance of counsel in the penalty phase.   Petitioner

must show both inadequate performance and, in the penalty phase context,

that there is a reasonable probability that absent counsel's inadequate

representation, the jury would not have sentenced him to death.  Kenley v.

Armontrout, 937 F.2d at 1303-04.

As noted earlier, "judicial scrutiny of counsel's performance must be

highly deferential." <u>Strickland</u>, 466 U.S. at 689. In fact, review under 28

U.S.C. § 2254 is twice deferential because this Court will apply a highly

deferential review of the state court decision and the state court is highly

deferential to the judgments of trial counsel. <u>Nooner v. Norris</u>, 402 F.3d

801, 808 (8th Cir. 2005). The degree of deference afforded to trial

counsel's performance directly correlates to the adequacy of the trial

counsel's investigation:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

<u>Id</u>. at 690-91. An "inadequate investigation can undermine the reasonableness of

an otherwise sound tactical decision to not put on evidence." <u>Link v. Luebbers</u>,

469 F.3d 1197, 1202 (8th Cir. 2006).

Before trial Petitioner underwent two psychiatric evaluations. At the

request of defense counsel, the trial court ordered a pretrial evaluation by Dr.

Richard Scott of the Missouri Department of Mental Health. Dr. Scott submitted

two reports to the trial court: one on Petitioner's adjudicative competency and the other on his mental state at the time of the alleged offense. Dr. Scott considered multiple sources in completing his evaluation, including: interviews with Petitioner, police reports, a personality test, a medical examiner report, an investigative memo, some of Petitioner's employment records, and Terri Cole's deposition and statements to police. Two diagnoses resulted from Dr. Scott's evaluation: (1) Alcohol Abuse in a Controlled Environment; and (2) Rule out Narcissistic Personality Disorder. Dr. Scott opined that even with these diagnoses, Petitioner did not suffer from a mental disease or defect within the meaning of Missouri statutes, and that Petitioner did not, as a result of mental disease or defect, lack capacity to understand the proceedings against him or to assist in his own defense. He also opined that Petitioner was not suffering from a mental disease or defect at the time of the alleged offense that rendered him incapable of knowing and appreciating the nature, quality, or wrongfulness of his conduct. Dr. Scott found no indication that Petitioner was "behaving in a manner suggesting severe impairment in his emotional or cognitive abilities."

After Dr. Scott's findings were filed with the trial court, Petitioner's trial counsel requested and was granted a second examination by a doctor of Petitioner's choosing. Dr. Michael Armour was paid by Petitioner's family to

evaluate him. Dr. Armour interviewed Petitioner and reviewed police reports, Dr. Scott's evaluations, depositions of Terri Cole, and a medical examiner's report. Dr. Armour opined that Petitioner was not suffering from a mental disorder that would qualify as a mental disease or defect, but he did diagnosis Petitioner with alcohol abuse. He found Petitioner competent to stand trial.

Petitioner's trial counsel, Dorothy Hirzy, testified at the PCR hearing about other avenues she investigated concerning Petitioner's background. She met with Petitioner's mother and sister routinely and questioned them about medical conditions, a family history of mental illness or alcohol abuse, and Petitioner's use of alcohol and drugs. Their responses raised no red flags. She reviewed some of Petitioner's employment records and Terri Cole's medical records. Petitioner himself informed her that he had not been treated for mental disease or defect and that he had only been in the hospital for minor things. He denied any mental problems or that he was depressed. He admitted to having drunk two beers on the night of the crime but he denied being drunk or on any drugs at the time of the offense, and he denied having an alcohol problem.

Petitioner's PCR counsel had him evaluated by Dr. William Logan, a board certified forensic psychiatrist. Dr. Logan interviewed Petitioner in October 2002, over four years after the crime. In preparation for the interview he reviewed

seventeen volumes of materials provided by Petitioner's PCR counsel, including

transcript and investigative materials, family medical and mental health records,

legal records, employment workers compensation records, educational records of

Petitioner and his family, and notes from interviews of Petitioner's friends and

family.  Dr. Logan later conducted telephone interviews with several witnesses.

Dr. Logan testified at the PCR hearing that Petitioner was suffering from an

extreme mental or emotional disturbance at the time of the offense, and he

diagnosed Petitioner with "major depression, single episode, mild to moderate

severity."  Dr. Logan said that major depressive episodes often follow severe

psychological stressors and he identified multiple possible stressors for Petitioner

in the months leading up to the crime.  These stressors included Petitioner's

turbulent relationship with his ex-wife Terri Cole, his relationship with his sons

and his being unable to contact them, financial strains caused by child support

wage garnishment, alcohol and steroid use, and Petitioner's and his family's

history of depression and alcoholism.

"[R]easonably diligent counsel may draw a line when they have good reason

to think further investigation would be a waste."  <u>Rompilla v. Beard</u>, 545 U.S. 374,

383 (2005).  The American Bar Association's Guidelines for capital defense work

provide that "investigations into mitigating evidence 'should comprise efforts to

discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" <u>Wiggins v. Smith</u>, 539 U.S. 510, 524 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)(emphasis added)).

In a recent non-death penalty habeas case, <u>Marcrum v. Luebbers</u>, 509 F.3d 489 (8th Cir. 2007), the Eighth Circuit rejected a similar ineffectiveness argument:

> Where counsel has obtained the assistance of a qualified expert on the issue of defendant's sanity and nothing has happed that should have alerted counsel to any reason why the expert's advice was inadequate, counsel has no obligation to shop for a better opinion. . . . The fact that a later expert, usually presented at habeas, renders an opinion that would have been more helpful to the defendant's case does not show that counsel was ineffective for failing to find and present that expert.

509 F.3d at 511; <u>see</u> <u>also</u> <u>Winfield v. Roper</u>, 460 F3d 1026, 1041 (8th Cir. 2006). Counsel's conduct here was much more thorough than in <u>Marcrum</u>. Ms. Hirzy testified at the PCR hearing that when she hired Dr. Armour for the second evaluation, she specifically told him that she was looking for mitigating factors. Although Dr. Armour testified that he did not recall this instruction from Hirzy, he admits that his standard mental status evaluation process includes an assessment of symptom presentation that would uncover signs of emotional or mental distress. Dr. Armour's evaluation specifically looks for signs of depression in a subject and

such disorders are routinely included on "Axis I" of the diagnostic system he used.

Dr. Scott used the same multi-axis assessment system, which also includes mood

disorders such as major depressive disorder on Axis I.  Dr. Scott testified that his

evaluations are often incorporated into mitigation evaluations when mental health

problems are discovered.  Neither doctor found any indications of a major

depressive disorder.

Petitioner also argues that the reports of Drs. Scott and Armour indicated a

need for further investigation into the possibility of a mitigating factor of extreme

emotional distress.  Both doctors mentioned that Petitioner abused alcohol, but

Petitioner's mother and sister denied that Petitioner had a drinking problem or that

there was a family history of such a problem.  Dr. Scott described the crime as

possibly reflecting "a frenzied, out-of-control attack," but that reference was based

on law enforcement's account of the crime and not on Petitioner's description of

the events.  In fact, such a description is counter to Petitioner's testimony, in

which he said that everything was going fine in his life at the time of the offense,

and that he went to Terri Cole's home simply to see his children.  When he met

with both Drs. Scott and Armour, Petitioner denied killing Anthony Curtis and

injuring Terri Cole.  Dr. Armour testified in the PCR hearing that it is much more

difficult to find that an individual was suffering from an extreme mental or

emotional disturbance at the time of the crime when he denies committing the crime.

Petitioner's trial testimony was not at all consistent with a theory of emotional distress. When asked by the prosecutor if he was calm when he went over to Terri Cole's home on the night of the incident, Petitioner described himself as "not angry," explaining that he "loved [his] ex-wife and [] didn't have no intentions of hurtin' her." Tr. Transcript at 1342. Given Petitioner's testimony and his family's denial of a history of mental disease or alcohol abuse, there is no indication that information regarding extreme mental distress was readily available to trial counsel.

Petitioner argues that even a cursory investigation would have included review of medical records, family and social history, and interviews of Petitioner's friends and family. Again, Hirzy did attempt to procure information on Petitioner's social and family history through multiple meetings with Petitioner's mother and sister. Hirzy also interviewed approximately twenty-five other witnesses provided by Petitioner and his family. None of these witnesses mentioned any mental health, depression, or alcohol problems with Petitioner or

his family.[17]  In the PCR hearing, Hirzy admitted she did not obtain any medical

records on Petitioner or his family.  She said that she had no reason to seek out

such reports because no one in the family her told her anything that would lead her

to suspect she needed to review them.

In Rompilla v. Beard the Supreme Court applied the Strickland standard to a

claim of failure of investigate.  545 U.S. 374 (2005).  Rompilla was "not a case in

which defense counsel simply ignored their obligation to find mitigating

evidence," but the sources counsel pursued proved unhelpful.  Rompilla's post-

conviction counsel, however, discovered potentially mitigating evidence in school

records, juvenile and adult incarcerations records, and from a further investigation

into defendant's troubles with alcohol.  The Supreme Court ultimately found

counsel was ineffective because he failed to review his client's prior conviction

---

[17]  Petitioner argues that this case is similar to Kenley v. Armontrout, 937 F.2d 1298 (1991), where the Supreme Court found defense counsel's performance deficient for failure to present available lay and expert mitigating evidence during the sentencing phase of a capital trial. The circumstances and facts of this case are clearly distinguishable.  In Kenley, defense counsel interviewed none of his client's family members to get a social history even though some of them volunteered to provide information.  Id. at 1306.  The mitigating evidence which trial counsel failed to present was not "hidden from counsel."  References were made to the mitigating evidence in the materials trial counsel had and such evidence would have been brought to his attention in the course of a simple review of those materials. Id. at 1307.  This situation is distinguishable from the facts here where none of the materials before trial counsel Hirzy indicated a history of mental illness.

file, which was readily available to the public.[18]  The Court distinguished between "sure bet" evidence, like the prior conviction file that defense counsel knew the prosecutor was going to use to prove aggravation, and evidence that could be potentially important such as school reports, juvenile records, and evidence of drinking habits.  Id. at 389.

In this case, none of the sources that Petitioner argues his counsel should have pursued were "sure bet" evidence of the type described by the Supreme Court in Rompilla.  Petitioner's trial counsel's investigation into mental or emotional disturbance was reasonable under the standard established in Strickland. Although it is always possible to pursue an investigation further, trial counsel's decision in this case was supported by reasonable professional judgment.  Counsel made a reasonable decision that further investigation was unnecessary.  She was a seasoned capital defense lawyer, who had tried 19 capital trials by the time she testified in the PCR hearing.

Based on her adequate investigation, trial counsel then made the strategic

---

[18]  The prosecutor had given defense counsel notice of his intent to use the defendant's prior conviction records to prove a history of felony convictions, and of his intent to use a victim's statement in a transcript from a prior rape conviction to emphasize defendant's violent character.  Despite this notice, defense counsel never reviewed a copy of his client's prior conviction file – a readily, available public document – before the trial began.  The Court found that this failure to examine the court file fell below the level of reasonable performance as established by Strickland.  Id. at 383.

choice not to submit the extreme mental or emotional disturbance mitigator to the trial court. Hirzy testified at the PCR hearing that she felt that characterizing Petitioner as a depressed alcoholic would be inconsistent with her penalty-phase strategy of humanizing him, with the information she had received from Petitioner and his family, and with Petitioner's trial testimony. This strategic decision was reasonable under the prevailing professional norms.

In addition, Petitioner has not established the second prong of <u>Strickland</u>, in that he has not shown a reasonable probability that the jury would have reached a different sentence. 466 U.S. at 694. The jury found two statutory aggravating circumstances and there is no reasonable probability that submitting the mitigating circumstance of extreme mental and emotional disturbance would have changed the balance of aggravating and mitigating evidence. The Missouri Supreme Court's conclusion was not an unreasonable determination of the law or the evidence.

### Claim 11: Ineffective Assistance of Counsel for Failing to Discover and Present Non-Expert Evidence of Petitioner's Troubled State of Mind

Petitioner makes many of the same arguments and relies on many of the same cases in his eleventh claim. He argues that counsel's failure to discover and present testimony from lay witnesses on his troubled state of mind around the time

of the offense was ineffective assistance of counsel.  According to Petitioner, three witnesses who did testify at his trial – James Dawson, Peter Ruffino, and Lillie Cole – were inadequately interviewed by his trial counsel, resulting in relevant evidence concerning his depressed and angry state of mind not coming out at trial. Petitioner also alleges that his physician, Dr. Fred Duhart, and the medical records maintained by Duhart, should have been presented to the jury.

The Missouri Supreme Court rejected this claim, and I find its holding to be a reasonable application of Strickland.  See Cole, 152 S.W.3d at 270.  The state court reasoned that "to have elicited lay testimony as to any perceived emotional disturbance could have been viewed by the jury as being contradictory, not only in terms of the expert's mental assessment of Appellant, but also in terms of counsel's mitigation theory to humanize the Appellant with good character evidence."  Id.  I agree with this conclusion.  "Counsel's decision not to call particular witnesses during the penalty phase of trial must be viewed as of the time it was made, and his decision is presumed to be one of trial strategy unless it is clearly shown not to be.  Winfield, 460 F.3d at 1033 (citations omitted).

The record reveals that Dawson would have testified that Petitioner started drinking more and smiling less after his separation from Terri Cole.  He would have told the jury that two weeks before the crime he observed Petitioner upset

and drunk, and Petitioner told him that Terri Cole had said that his kids "had a new Daddy now." Dawson also admitted that Petitioner showed no signs of being upset or drunk when he saw him on the night of the crime. Any testimony that could have been provided by Dawson on Petitioner's depression and alcoholism would not have related to Petitioner's mental state at the time of the offense. The suggested testimony would have contradicted other testimony by Dawson, and Petitioner's own testimony on the fact that he was not angry or upset on the night of the crime.

Peter Ruffino, a co-worker of Petitioner's, would have testified that Petitioner was normally upbeat and cheerful with a good attitude. However, Ruffino would have described Petitioner as depressed, angry, and upset on the morning of the crime. This testimony is, of course, completely contrary to the proposed testimony of James Dawson. It is also completely contrary to Petitioner's own testimony that he was not upset or angry before going to Terri Cole's home. In addition, when Ruffino testified in the guilt phase of the trial for the State, he told the jury that he heard Petitioner threaten the life of Terri Cole on the morning of the crime. It was certainly reasonable trial strategy for Petitioner's counsel not to call Ruffino to testify in the penalty phase, as doing so undoubtedly would have reminded the jury of his earlier testimony.

Petitioner also argues that his mother, Lillie Cole, should have been questioned about the signs of depression she observed in Petitioner the week before the crime. Such questioning is illogical given Lillie Cole's repeated denials that Petitioner was depressed or had a drinking problem, and her denial of such problems in their family history.

According to Petitioner, trial counsel also failed to adequately investigate his mental health by speaking with and obtaining medical records from his doctor, Fred Duhart. Because trial counsel never interviewed Dr. Duhart, this argument is the same as that made in claim 10 concerning the extent and scope of trial counsel's investigation into Petitioner's mental health, and specifically into his medical records. Dr. Duhart's records reflect that Petitioner visited him in 1986, once in 1994, and once in 1996. This crime occurred in 1998 and Dr. Duhart's testimony would not have been relevant to Petitioner's mental state at the time of the offense.

Finally, Petitioner argues that trial counsel's strategy of humanizing him by describing his good deeds was unreasonable. The Missouri Supreme Court described this as a "reasonable choice of trial strategy" and stated:

> Appellant's trial counsel was a seasoned, death-penalty litigation attorney, having tried nineteen capital murder cases. Counsel elected to pursue a strategy of presenting good character

evidence, including Appellant's work ethic, religious upbringing, and participation in church activities, as a way to humanize Appellant to the jury.

Cole, 152 S.W.3d at 269.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. Courts are very deferential to a counsel's choice of strategy. I have already found trial counsel's investigation reasonable. I now find that counsel's strategy was not constitutionally deficient, but instead was objectively reasonable under the circumstances.

Petitioner asserts that his trial counsel contradicted her own trial strategy by injecting the issue of his past misconduct into the trial by arguing for the mitigating circumstance of "no significant criminal history." Arguing that a person has no significant criminal history and that they are of good character are consistent theories. Petitioner's counsel formulated a penalty-phase theory based on the twenty-five witnesses she had interviewed, the records she had reviewed, the testimony of Petitioner during the guilt phase of the trial, and the reports of two mental health experts. The theory was reasonable under the circumstances of the case.

**Claim 12: Ineffective Assistance of Counsel for
Failing to Investigate and Present Evidence Regarding
Petitioner's Positive Adjustment to Prison Life**

In Petitioner's final ineffective assistance claim, he argues that his trial counsel performed deficiently during the penalty phase by failing to investigate and present evidence of the petitioner's good institutional adjustment, by calling three jail witnesses. The Missouri Supreme Court rejected this claim, citing trial counsel's testimony at the 29.15 motion hearing that "her experience with presenting evidence on a defendant's good behavior in jail was generally ineffective," and by stating that the testimony of the three jail witnesses would have overlapped with other good character evidence that was presented at the sentencing. Cole, 152 S.W.3d at 269-70.

The Supreme Court held in Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982), that a sentencer may not be precluded by the State from considering any relevant mitigating evidence, and although the sentencer may determine the weight given to that evidence, it may not give it no weight at all. The Court applied this holding in Skipper v. South Carolina, 476 U.S. 1, 4 (1986), and found evidence of a "defendant's disposition to make a well-behaved and peaceful adjustment to life in prison" to be relevant mitigating evidence.

During the penalty phase of Petitioner's trial, ten witnesses testified as to his

character and good acts. These witnesses consisted of Petitioner's family members, childhood or neighborhood friends, friends of his family, and his church pastor. None of them testified concerning his behavior in jail. At the PCR hearing, Petitioner's trial counsel, Dorothy Hirzy, testified that she had asked a couple of correctional officers at the jail if there was anything they could say that would be helpful to Petitioner, but learned of no potentially relevant testimony. Hirzy admits that she never investigated any potential witnesses as to Petitioner's attendance at religious services and Bible study groups while he was incarcerated, and that she was unaware he attended such services in jail. She did know that Petitioner had a job in jail but she did not think that information would be helpful in his case. Petitioner had a prior conviction for failure to return to confinement when he had been sentenced to work release. Hirzy stated that this prior conviction was one of her main concerns with putting jail guards on the stand. She felt that a reminder of the prior conviction would outweigh any good character evidence a jail employee could provide.

The three witnesses Petitioner argues should have been investigated and presented by his counsel were two jail employees, William Bradford and Romel Cochrel, and a nun who ran the jail religious services, Sister Judith Klump. Bradford was in charge of the inmates housed on Petitioner's floor. He would

have testified that Petitioner was an ideal inmate who followed rules, was mild mannered, and an excellent worker. Cochrel was Petitioner's housing unit officer and he would have testified that Petitioner was an exceptional worker with no discipline problems. Sister Klump met Petitioner through the religious classes that she taught at the jail. She would have testified that she often asked Petitioner to start her Scriptures class with a prayer because he spoke from the heart, and that Petitioner was a polite class leader who was respected among the inmates.

Although Petitioner's friends and family testified about his good character, there was no testimony from disinterested witnesses about his good behavior while in prison. Under Skipper, this evidence would undoubtedly have been admissible, but the question before me is whether counsel can be found ineffective for failing to introduce it. The Eighth Circuit has cautioned that Skipper cannot be read to require counsel to present all possible mitigating evidence. See Skillicorn v. Luebbers, 475 F.3d 965, 976 (8th Cir. 2007). Nevertheless, I believe the Missouri court's finding that this evidence would simply have been cumulative is questionable, because testimony from "jailers who would have had no particular reason to be favorably predisposed toward one of their charges," may well have been "given much greater weight by the jury." Skipper, 476 U.S. at 8. However, I need not decide this issue because I agree with the State's argument that Petitioner

cannot satisfy the prejudice prong of <u>Strickland</u>.

Under the second prong of <u>Strickland</u>, the Petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. Failure to satisfy either of the two <u>Strickland</u> prongs is fatal to the Petitioner's claim. <u>See</u> <u>Pryor</u>, 103 F.3d at 713. Under the facts of this case, I find no reasonable probability that the jury have rejected the death penalty had it heard the testimony of the three jail witnesses.

First, the issue of Petitioner's behavior while in jail was not disputed, nor was it a point emphasized by the State. Unlike other cases, the prosecutor here never argued to the jury that Petitioner should get death over life in prison because he would be dangerous to other prisoners. For example, in <u>Skipper</u>, the prosecutor argued that the defendant would be a disciplinary problem while in prison and that he would likely rape other prisoners. 476 U.S. at 3. The Court noted that this argument by the prosecutor made evidence of a peaceful transition to prison life especially relevant and mitigating. <u>Id.</u> at 5 n.1. The prosecutor in this case did not specifically rely on a prediction of future dangerousness in asking for the death penalty.

Second, the three jail workers would have testified to Petitioner's good

behavior while incarcerated, but they all admitted to not being aware of Petitioner's prior conviction for failing to return to confinement from work release. The State likely would have raised this issue with the witnesses on cross-examination, as it did in the PCR hearing. This evidence would have diminished any weight the jurors would have given to the jailers' testimony. In fact, the jurors might have given no weight at all to the testimony because they may have considered Petitioner's behavior while awaiting trial – a time when a prisoner has an incentive to behave responsibly in anticipation of his behavior being discussed at trial – to be outweighed by Petitioner's behavior during earlier times of incarceration, including the time he violated his work release.[19]

For these reasons, I find no reasonable probability that the testimony of these three jail witnesses would have changed the outcome of the sentencing proceeding. Trial counsel's failure to introduce evidence of Petitioner's positive adjustment to prison life was not objectively unreasonable, nor did it prejudice the Petitioner under <u>Strickland</u>.

---

[19] Justice Powell's concurring opinion in <u>Skipper</u> noted that a capital defendant "has every incentive to behave flawlessly in prison if good behavior might cause the sentencing authority to spare his life." 476 U.S. 9-14.

## Claim 15: Exclusion of Evidence that Petitioner's
## Friends and Family Would Visit Him in Prison

Petitioner's fifteenth claim raises similar issues to those discussed in claim twelve. In this claim, Petitioner argues that the trial court's exclusion of testimony from Petitioner's friends and family that they would visit him in prison improperly prevented the jury from hearing relevant, mitigating evidence in violation of federal law based on <u>Skipper</u>. The State argues that federal review of this claim is barred because the Missouri Supreme Court, after briefly discussing the merits of the claim, found that it was not preserved for review. <u>Cole</u>, 71 S.W.3d at 175.

Petitioner contends that this claim is not defaulted because the Missouri procedural rule, under which the state court based its decision, was not both "adequate" and "independent" of the federal question presented. <u>See Coleman v. Thompson</u>, 501 U.S. at 729-30. Petitioner asserts many arguments for why the Missouri procedural rule is inadequate and why following the rule would have been futile for defense counsel. Despite my belief that the Missouri rule would be found adequate and independent of any federal question after a thorough analysis, there is no reason to belabor this point because this claim can be more easily resolved on the merits. <u>See Barrett v. Acevedo</u>, 169 F.3d 1155, 1162 (8th Cir. 1999) ("Although the procedural bar issue should ordinarily be resolved first,

judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated.").

The following exchange occurred outside the hearing of the jury, following the jury's verdict in the guilt phase and before the presentation of any evidence in the penalty phase:

> MR. REILLY:      We did file a motion in limine today, Judge.  I believe that's before you.  Our motion speaks for itself.  There are certain matters that we would ask the Court to preclude the Defense from arguing in this case....
>
>           In addition to that, I would ask that the Court preclude Miss Hirzy from inquiring whether or not they would visit the Defendant, Mr. Cole, in prison.  If he were given life in prison.
> ...
> MS. HIRZY:       ... I mean this is a death penalty case.  I don't understand why I cannot ask a relative if they care about him and will visit him in prison.
>
> THE COURT:      I'll allow you to that extent because it's obvious that they have --
>
> MR. REILLY:      But that's obvious.  She can ask if they care about him.  But there's a case right on point that says --
>
> MR. WALDEMER:       That's a direct quote from Nicholson.
>
> THE COURT:      Fact that convicted relatives care about him in prison is not --
>
> MS. HIRZY:      How much are they gonna limit us?  I mean, can I even bother to bring a witness in here?

(Off record discussion)

THE COURT:       Back on the record.  As to relatives' indication about them visiting him in prison, sustained.  Defendant will not be allowed to go into visiting him in prison if he's given a life sentence. Care about him is okay.  Visiting him in prison is not.

MS. HIRZY:       Okay.  Well, I object strenuously for the record, Your Honor.

THE COURT:  That's fine.  So the motion in limine is sustained.

Tr. Transcript at 1498-1500.[20]

The Court in <u>Skipper</u> found evidence of a "defendant's disposition to make a well-behaved and peaceful adjustment to life in prison" to be relevant, mitigating evidence and therefore admissible.  476 U.S. at 4.  Here, Petitioner argues that evidence of his friends and family visiting him in prison would demonstrate that he would adjust well to prison, and therefore such evidence should have been admitted.  I see no such obvious logical nexus.  Just because a prisoner has visitors does not mean that he will adjust well to life in prison.  A prisoner may chose to behave in prison because he has visitors who come to see him, but he may also chose not to behave in prison even when he has visitors.  <u>Skipper</u> mandates the

---

[20]  The Missouri case discussed by counsel with the trial judge, cited by the State in its motion in limine, and relied on by the trial court in its ruling is <u>State v. Nicklasson</u>, 967 S.W.2d 596, 619 (Mo. 1998), which held that testimony that a petitioner's relatives would visit him in prison, if he was given a life sentence, is irrelevant for penalty-phase mitigating purposes.

allowance in capital cases of mitigating evidence that reflects upon a defendant's character or record.  Id. at 4.  Evidence that Petitioner's family and friends would visit him in prison may reflect upon *their* character, but it does not reflect upon Petitioner's character or his record.  The state court's exclusion of the prison visitor evidence was not contrary to, nor an unreasonable application of, federal law.

## Claim 17: Impermissibly Vague Aggravating Circumstance

Petitioner concedes in his reply brief that intervening authority – Rousan v. Roper, 436 F.3d 951 (8th Cir. 2006) – issued by the Eighth Circuit during the briefing of this case, precludes relief on this claim.  I agree and therefore no extended analysis is necessary.  Petitioner's seventeenth claim is denied.

## Claims 18 & 19: Jury Instructions

In claims eighteen and nineteen, Petitioner asserts that his rights were violated by two jury instructions given in the penalty phase of his trial, over his defense counsel's objections.  Instruction 21 (claim 18) reads as follows:

> As to Count I, you are not compelled to fix death as the punishment even if you do not find the existence of facts and circumstances in mitigation of punishment sufficient to outweigh the facts and circumstances in aggravation of punishment.  You must consider all the evidence in deciding whether to assess and declare the punishment at death.  Whether that is to be your final decision rests with you.

Instruction 22 (claim 19) reads as follows:

You will be provided with forms of verdict for your convenience. You cannot return any verdict imposing a sentence of death unless all twelve jurors concur in and agree to it, but any such verdict should be signed by your foreperson alone.

As to Count I, if, you unanimously decide, after considering all of the evidence and instructions of law given to you, that the defendant must be put to death for the murder of Anthony Curtis, your foreperson must write into your verdict all of the statutory aggravating circumstances submitted in Instruction No. 18 which you found beyond a reasonable doubt, and sign the verdict form so fixing the punishment.

If you unanimously decide, after considering all of the evidence and instructions of law, that the defendant must be punished for the murder of Anthony Curtis by imprisonment for life by the Department of Corrections without eligibility for probation or parole, your foreperson will sign the verdict form so fixing the punishment.

If you are unable to unanimously find the existence of at least one statutory aggravating circumstance beyond a reasonable doubt, as submitted in Instruction No. 18, or if you are unable to unanimously find that there are facts and circumstances in aggravation of punishment which warrant the imposition of a sentence of death, as submitted in Instruction No. 19, then your foreperson must sign the verdict form fixing the punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

If you do unanimously find the matters described in Instructions No. 18 and 19, but are unable to agree upon the punishment, your foreperson will sign the verdict form stating that you are unable to decide or agree upon the punishment. In such case, the Court will fix the defendant's punishment at death or at imprisonment for life by the Department of Corrections without eligibility for probation or parole. You will bear in mind, however,

that under the law, it is the primary duty and responsibility of the jury to fix the punishment.

When you have concluded your deliberations you will complete the applicable form to which all twelve jurors agree and return it with all unused forms and the written instructions of the Court.

The Missouri Supreme Court rejected Petitioner's claims as related to both

of these instructions:

Appellant's final two points concern alleged trial court errors in the submission of specific jury instructions. Appellant first claims the trial court erred in not sustaining his objection to submitting Instruction No. 21 (MAI-CR3d 313.46A). According to Appellant, this instruction directs the jury to consider all of the circumstances in determining if the sentence should be death, but fails to require the same consideration in deciding if the penalty should be life in prison without probation or parole. Appellant argues that this prejudiced him in violation of his Sixth, Eighth, and Fourteenth Amendment rights because the instruction left the jury free to ignore the mitigating evidence while determining whether death or life was the appropriate punishment.

Appellant's second claim of instructional error involves Instruction No. 22 (MAI-CR3d 313.48A), the "verdict mechanics" instruction. Appellant argues this instruction specifically references consideration of aggravating circumstances in relation to determining if the penalty should be life in prison or death, but does not specifically reference consideration of mitigating evidence during this consideration. Appellant contends this instruction is fatally flawed, and does not comply with section 565.030.4(3), for omitting an essential "third step" directing the jury to weigh the mitigating circumstances as compared to the aggravating circumstances when determining the appropriate sentence.

This Court, however, as Appellant concedes, has previously rejected both of these arguments in *State v. Storey*. Instruction No. 21 "adequately informs the jury that it must consider all of the circumstances, including the mitigating circumstances, in determining the appropriate punishment." Instruction No. 22 directs the jury to consider "all of the evidence and instructions of law" when determining the level of punishment, which includes in this case Instruction No. 20 specifically requiring the jury to consider any fact or circumstance in mitigation of punishment. These instructions in no way preclude the jury from giving effect to the mitigating evidence, and having ruled on these issues previously, an extended discussion on either point would have no precedential value.

Cole, 71 S.W.3d at 175-76 (footnotes omitted).

A juror deciding sentencing cannot be precluded from considering, and also may not refuse to consider, any constitutionally relevant mitigating circumstance. Penry v. Lynaugh, 492 U.S. 302, 317-18 (1989) (citing Lockett v. Ohio, 438 U.S. 586 (1978); Eddings v. Oklahoma, 455 U.S. 104 (1982)). A state is permitted to shape and structure a jury's consideration of mitigating evidence as long as the jury is not precluded from giving effect to any relevant mitigating evidence. Buchanan v. Angelone, 522 U.S. 269, 276-77 (1998) (citing Johnson v. Texas, 509 U.S. 350, 362 (1993)). The standard for determining whether jury instructions satisfy these basic principles is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Id. (citing Boyde v. California, 494 U.S.

370 (1990)).

The Eighth Circuit has consistently upheld instructions similar to those given here.  See Middleton v. Roper, 498 F.3d 812, 818-819 (8th Cir. 2007); Ramsey v. Bowersox, 149 F.3d 749, 757 (8th Cir. 1998); Bolder v. Armontrout, 921 F.2d 1359, 1367 (8th Cir. 1990).  Missouri's instructional scheme has been held to adequately afford a jury the opportunity to fully consider and weigh any and all mitigating circumstances.  Ramsey, 149 F.3d at 757.  The United States Supreme Court has also endorsed an instructional scheme similar to the one employed in Petitioner's trial.  Buchanan, 522 U.S. at 272-77.

Petitioner argues that the language of Instruction No. 21 favors death because the instruction reminds the jury to consider all the evidence in deciding whether death is appropriate, but it fails to mention that the same requirement applies in determining if life imprisonment is appropriate.  As a result, Petitioner asserts that the instruction prevented the jurors from "giving effect" to mitigating evidence.  Similar to the instruction in Buchanan, which reminded the jurors to consider "all the evidence" in making their decision, Instruction No. 21 instructed the jurors to consider "all the circumstances" in deciding whether to impose a death sentence.  The Supreme Court found that such direction in the instruction "afforded jurors an opportunity to consider mitigating evidence" and

"did not foreclose the jury's consideration of any mitigating evidence." <u>Buchanan</u>,

522 U.S. at 277. The same finding is appropriate here.[21] Instruction No. 21 does

not preclude consideration of mitigating evidence, nor does it prevent jurors from

"giving effect" to it. I find no reasonable likelihood that the jury applied

Instruction No. 21 in a way that prevented the consideration of constitutionally

relevant evidence.

In Petitioner's nineteenth claim, he asserts that Instruction No. 22 failed to

include the "third step" of the deliberation process, as required under Missouri

statute. According to Petitioner, the instruction failed to tell the jury that if, after

finding at least one statutory aggravating circumstance, each juror determined that

the mitigating circumstances outweighed the aggravating circumstances, the jury

must sentence the defendant to life imprisonment. Mo. Rev. Stat. § 565.030.4(3).

Although this language may not be included in Instruction No. 22, it is clearly

stated in Instruction No. 20:

---

[21] Petitioner argues that this case is distinguishable from <u>Buchanan</u> because the prosecutor in <u>Buchanan</u> acknowledged the validity and existence of the mitigating circumstances, and only argued that a death sentence was appropriate. Although the Supreme Court in <u>Buchanan</u> considered and discussed the entire context in which the instructions were given, including the arguments made by counsel, the context of the arguments was merely additional support for the Court's holding – not the basis for the Court's ruling. 522 U.S. at 278 ("*Even were we to entertain some doubt as to the clarity of the instructions*, the entire context in which the instructions were given expressly informed the jury that it could consider mitigating evidence." (emphasis added)).

> If each juror determines that there are facts and circumstances in mitigation of punishment sufficient to outweigh the evidence in aggravation of punishment, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

The jury instructions are presented to the jury together and the Court will review them as a whole for constitutional error. Therefore, the fact that specific language may be absent from one numbered instruction but included in another, presents no grounds for habeas relief. Petitioner's eighteenth and nineteenth claims are denied.

## Claim 20: Cumulative Effect of Errors

In Petitioner's final claim, he alleges that his rights were violated by the cumulative effect of the errors asserted in his petition. Because I have found that Petitioner is not entitled to relief on any of the grounds asserted in his petition, there is no cumulative prejudicial effect which would entitle him to relief. The Eighth Circuit has stated that a habeas petitioner cannot show prejudice under a cumulative error theory when none of the grounds for error alone were found to be prejudicial. Hall v. Luebbers, 296 F.3d at 692 (citing Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996)) ("In our circuit a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test."). Petitioner's final claim is denied.

## V.  CONCLUSION AND CERTIFICATE OF APPEALABILITY

After a thorough review of the record in this case, I find that all of Petitioner's claims for habeas relief are either procedurally barred or fail on the merits, and must be denied.

Under 28 U.S.C. § 2253, an appeal may not be taken to the court of appeals from the final order in a § 2254 proceeding unless a circuit justice or judge issues a Certificate of Appealability.  28 U.S.C. § 2253(c)(1)(A).  To grant such a certificate, the justice or judge must find a substantial showing of the denial of a federal constitutional right.  Id. at § 2253(c)(2); see Miller-El v. Cockrell, 537 U.S. 322, 327 (2003);  Tiedeman v. Benson, 122 F.3d 518, 522 (8th Cir. 1997).  A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings.  Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997) (citing Flieger, 16 F.3d at 882-83).  For claims that are procedurally barred, "a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Slack v. McDaniel, 529 U.SD. 473, 484 (2000).

Applying these standards, I conclude that Petitioner is entitled to a

Certificate of Appealability on the claims listed here as numbers 2 (improper guilt phase closing argument), 4 (Batson violation), 7(restraints), 10 (ineffective assistance regarding mental state), 11 (same), and 16 (restraints). I do not find that reasonable jurists could differ on his remaining claims, so I will deny a Certificate of Appealability on all other issues.

Accordingly,

**IT IS HEREBY ORDERED** that Missouri Attorney General Jeremiah W. Nixon is added as a proper party respondent.

**IT IS FURTHER ORDERED** that the petition for writ of habeas corpus [#1, 19] filed by Andre Cole is denied.

**IT IS FURTHER ORDERED** that Cole is entitled to a Certificate of Appealability on the claims listed here as numbers 2 (improper guilt phase closing argument), 4 (Batson violation), 7(restraints), 10 (ineffective assistance regarding mental state), 11 (same), and 16 (restraints). He is not entitled to a Certificate of Appealability on his remaining claims.

**IT IS FURTHER ORDERED** that the motion for leave to substitute attorney [#56] and for leave to apply for admission pro hac vice without payment of fee [#57] are granted.

**IT IS FINALLY ORDERED** that attorney Terri Backhas is admitted <u>pro</u> <u>hac</u> <u>vice</u>.

A separate judgment in accord with this opinion is entered this same date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of September, 2008.